**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ASPEN RIDGE ESTATES, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| UNITED CITY OF YORKVILLE, an | ) | |
| Illinois municipal corporation, | ) | Plaintiff Demands Trial |
| ARTHUR F. PROCHASKA, JR., in his | ) | By Jury On Each Count |
| individual and corporate capacities, | ) | |
| JOHN JUSTIN WYETH, in his individual | ) | FILED: AUGUST 7, 2008 |
| and corporate capacities, | ) | 08CV4479 |
| JAMES BOCK, in his individual and | ) | JUDGE KOCORAS |
| corporate capacities, | ) | MAGISTRATE JUDGE MASON |
| DEAN WOLFER, in his individual and | ) | |
| corporate capacities, | ) | JFB |
| JOSEPH BESCO, in his individual and | ) | |
| corporate capacities, | ) | |
| PAUL JAMES, in his individual and | ) | |
| corporate capacities, | ) | |
| MARTY MUNNS, in his individual and | ) | |
| corporate capacities, | ) | |
| ENGINEERING ENTERPRISES, INC., | ) | |
| an Illinois corporation, | ) | |
| TRAVIS MILLER, in his individual and | ) | |
| corporate capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff, ASPEN RIDGE ESTATES, LLC, by its attorneys, LEONARD S. SHIFFLETT,

ROBERT L. GAMRATH, and ANTHONY P. STEINIKE, complains against UNITED CITY

OF YORKVILLE, ARTHUR PROCHASKA, JR., JOHN JUSTIN WYETH, JAMES BOCK,

DEAN WOLFER, JOSEPH BESCO, PAUL JAMES, MARTY MUNNS, ENGINEERING

ENTERPRISES, INC., and TRAVIS MILLER, (referred to sometimes hereinafter collectively as "Defendants") as follows:

## I. **PARTIES**

1.      Plaintiff, Aspen Ridge Estates, LLC ("Aspen Ridge"), is an Illinois limited liability company with its principal place of business in Mokena, Illinois.

2.      The United City of Yorkville ("Yorkville" or "City") is an Illinois municipal corporation located in Kendall County, Illinois.

3.      Defendant, Arthur F. Prochaska, Jr. ("Prochaska"), is the former Mayor of the Yorkville; he resides in Kendall County, Illinois.

4.      Defendant, John Justin Wyeth ("Wyeth"), is the former City Attorney for Yorkville; he resides in Kendall County, Illinois.

5.      Defendant James Bock ("Bock") is a former Alderman for Yorkville; he resides in Kendall County, Illinois.

6.      Defendant Dean Wolfer ("Wolfer") is a former Alderman for Yorkville; he resides in Kendall County, Illinois.

7.      Defendant, Joseph Besco ("Besco") is a current Alderman for Yorkville; he resides in Kendall County, Illinois.

8.      Defendant, Paul James ("James") is a former Alderman for Yorkville, he resides in Kendall County, Illinois.

9.      Defendant, Marty Munns, ("Munns") is a current Alderman for Yorkville, he resides in Kendall County, Illinois.

10.      Defendant, Engineering Enterprises, Inc., is an Illinois corporation with its principal place of business at 52 Wheeler Road, Sugar Grove, Illinois.

11.     Defendant, Travis Miller ("Miller") is the current City Planner for Yorkville, he resides in Kendall County, Illinois.

## II.  JURISDICTION AND VENUE

12.     This action arises under the United States Constitution, 42 U.S.C. § 1983 and Illinois common law.  This action seeks redress for violations of federal constitutional law and pendent state common law claims.  This Court has subject matter jurisdiction over Counts I and II of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1343, under 42 U.S.C. § 1983, and supplemental jurisdiction over Counts III, IV and V pursuant to 28 U.S.C. § 1367(a) as each of those claims is so related to the claims within the Court's original jurisdiction that they form part of the same cause or controversy under Article III of the United States Constitution.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because at least one Defendant resides in the judicial district and all Defendants reside within the State of Illinois.

## III.  FACTS COMMON TO ALL COUNTS

### A.     The Aspen Ridge Annexation Agreement.

14.     Aspen Ridge is the beneficial owner of real property (pursuant to a land trust agreement with Old Second National Bank), consisting of 126 acres (more or less) located at what was in 2006, the southwesterly edge of Yorkville (the "Aspen Ridge Property").  A true and correct copy of the legal description of the Aspen Ridge Property is attached hereto as Exhibit A.

15.     In July 2004, Paul R. Dresden ("Dresden"), a duly authorized agent of Aspen Ridge, met with Yorkville officials to discuss the acquisition and annexation of the Aspen Ridge Property into Yorkville for development as a single family residential community.

16.    Over the next year and a half, numerous meetings and conferences were held with Yorkville officials for the purpose of discussing the development of the Aspen Ridge Property and negotiating an annexation agreement for the Aspen Ridge Property.

17.    At or around December 2005 rumors began circulating that the owner of the Hamman Farm Property wanted to develop that property as a landfill.  The Hamman Farm Property is located to the southwest of the Aspen Ridge Property and at that time, outside the boundaries of the City of Yorkville.

18.    Under Illinois law, in order for Yorkville to control and host a landfill on the Hamman Farm Property, Yorkville needed to annex the Hamman Farm Property into the City.

19.    However, in order to lawfully annex the Hamman Farm Property, Yorkville had to annex several other adjoining properties (the "Annexation Corridor"), including the Aspen Ridge Property, so that the Hamman Farm Property would be contiguous to the corporate boundaries of Yorkville when it was annexed.

20.    In May 2006, Dresden again met with Yorkville officials, including Wyeth and Miller, among others, to further negotiate the annexation of the Aspen Ridge Property into Yorkville (the "Annexation Meeting").  At the Annexation Meeting, Dresden directly asked those present what, if anything, Yorkville knew about a proposed landfill on the Hamman Farm Property.

21.    All Yorkville city officials in attendance at the Annexation Meeting, including Wyeth and Miller, expressly denied that Yorkville had any plans to host a landfill on the Hamman Farm Property.

22.    Had the Yorkville officials in attendance acknowledged that Yorkville intended to host a landfill on the Hamman Farm Property, Dresden would have refused to annex the Aspen

Ridge Property into Yorkville under the terms of the proposed Annexation Agreement, as the existence (and even the possibility of) such a landfill would severely devalue the Aspen Ridge Property.

23.     As a result of the representations made by Yorkville city officials at the Annexation Meeting, including those made by Wyeth and Miller, Aspen Ridge proceeded to annex the Aspen Ridge Property to Yorkville on August 8, 2006 and entered into the Aspen Ridge Annexation Agreement on August 31, 2006 (the "Annexation Agreement"), agreeing to develop the property with a single family residential community.  A true and correct copy of the Annexation Agreement is attached hereto as Exhibit B.  Though actually executed by Aspen Ridge on August 31, 2008, Wyeth unilaterally dated the Annexation Agreement August 8, 2006.

24.     Yorkville officially annexed the Aspen Ridge Property via City Council action on August 8, 2006.  *See* Yorkville Ordinance No. 2006-76, a true and correct copy of which is attached hereto as Exhibit C.

25.     Defendants' representations to Aspen Ridge in May 2006 that Yorkville had no knowledge of or plans to host a landfill at the Hamman Farm Property were knowingly false.  At the time of the Annexation Meeting, Defendants had already agreed amongst one another that Yorkville would annex the Hamman Farm Property to Yorkville and otherwise take the necessary steps to permit the hosting of a landfill on that property (the "Landfill Project").

26.     In order for that Landfill Project to go forward, Defendants needed to create the Annexation Corridor, and therefore needed Aspen Ridge to agree to the annexation of the Aspen Ridge Property into Yorkville.  As set forth below, Defendants began engaging in a scheme to fraudulently induce Aspen Ridge to agree to the annexation of the Aspen Ridge Property in early 2006, prior to the Annexation Meeting at which Wyeth and Miller denied any knowledge of

Yorkville's plan to annex the Hamman Farm Property, and prior to the execution of the Annexation Agreement by Aspen Ridge.

27.    As stated above, the owners and developers of the Hamman Farm Property (the "Developers") wanted to use that property as a landfill.  Typically, landfill operators pay "tipping" fees to the government unit that controls the siting and permit process, *i.e.*, the governmental unit that has jurisdiction over the property.  The rate of the tipping fees is negotiable between the operator/developer and the governmental unit.  The total amount of tipping fees to be paid is a function of how much material is deposited in the landfill.  The tipping fees to be generated by the Hamman Farm Property are likely to exceed $1,000,000 per year over the useful life of the landfill.

28.    Prior to September 26, 2006, the Hamman Farm Property was under the jurisdiction of Kendall County, Illinois, and was not annexed to Yorkville.

29.    Sometime shortly after the annexation of the Hamman Farm Property into Yorkville, Dresden contacted Bart Olsen, the Assistant City Administrator for Yorkville, to inquire as to why Yorkville officials had annexed the Property to host a landfill after expressly denying any plan to do so in May 2006.  Olsen stated in response that, "it's for the tipping fees."

**B.    Defendants' Scheme to Fraudulently Induce Aspen Ridge to Agree to the Annexation of the Aspen Ridge Property.**

30.    At or around March 2006 (and on information and belief months prior to March 2006) Wyeth, Prochaska, Miller, and other Yorkville city officials including then Yorkville Aldermen Bock, Wolfer, Besco, James, and Munns (collectively the "Yorkville Aldermen"), along with EEI, began planning an intentional scheme to fraudulently induce Aspen Ridge to agree to the annexation of the Aspen Ridge Property into Yorkville as an integral part of the

Annexation Corridor, and therefore allow Yorkville to annex and host a landfill on the Hamman Farm Property.

31.     This is evidenced by, among other things, three memos dated April 6, 2006 and written by Wyeth to all Yorkville Aldermen and Prochaska wherein Wyeth outlines Defendants' scheme to defraud Aspen Ridge (the "Wyeth Memos").   A true and correct copy of the Wyeth Memo entitled "Meeting with County Staff re: Landfill" is attached hereto as Exhibit D.   A true and correct copy of the Wyeth Memo entitled "Common Theme and Logic for Landfill" is attached hereto as Exhibit E.   A true and correct copy of the Wyeth Memo entitled "Southwest Developments (Silver Fox, Evergreen Farm, Aspen Ridge, Chally Farm, Anderson Farm, and Meadowbrook Subdivision) is attached hereto as Exhibit F.

32.     In March 2006, Defendants were aware that Developers of the Hamman Farm Property had approached Kendall County about hosting a landfill on the Hamman Farm Property.  *See* Exhibit D, p. 1.

33.     At that time, Wyeth advised Prochaska and the Yorkville Aldermen that in the event Kendall County chose to host the landfill, Yorkville would, "suffer the entire burden," that would accompany the landfill, "while obtaining little benefit."  *See* Exhibit E, p.2.

34.     Wyeth then advised Prochaska and the Yorkville Aldermen, "to strongly consider controlling the process through annexation and hosting."  *Id.*

35.     Wyeth further advised Prochaska and the Yorkville Aldermen that a landfill on the Hamman Farm Property (whether hosted by Kendall County or Yorkville) would directly and considerably  impact Yorkville, including creating increased traffic and offensive odors.  *See* Exhibit E, p.1.  Wyeth further represented in his Memos that in time, Yorkville would be the only municipality bearing the burden of the landfill.  *See Id.*

36.     Wyeth then advised Prochaska and the Yorkville Aldermen that, as a result of this "All Burden/ No Benefit" scenario, Yorkville should consider hosting the landfill. *See Id.* As a result, Defendants identified and set out to accomplish a two-step scheme to host the landfill. First, Yorkville needed to "gain control of the process" and create the Annexation Corridor, so as to create the necessary contiguity between the Yorkville corporate boundaries and the Hamman Farm Property. *See* Exhibit E, p. 2.

37.     Defendants' second step was to mislead property owners in the Annexation Corridor into thinking they would receive an objective benefit by annexing into Yorkville, while at the same time intentionally concealing their plans to host the landfill. *See* Exhibit F, p.1.

38.     Defendants were aware at this time that the landowners of the Southwest Developments (Aspen Ridge, Silver Fox, Evergreen Farm, Chally Farm, Anderson Farm, and Meadowbrook) which comprised a portion of the Annexation Corridor would not agree to annexation if they knew that Yorkville planned to host a landfill on the Hamman Farm Property, as the development of a landfill on the Hamman Farm Property would be inconsistent with the plans to develop their properties and would devalue their properties. *See* Exhibit F, p.1.

39.     As such, Defendants misrepresented to Aspen Ridge (and others) that Yorkville's purpose in annexing the Southwest Developments was to create a "Special Service Area" ("SSA") so that those landowners could split the expenses of extending utility services and infrastructure to their properties." *See* Exhibit F, p.2.

40.     Defendants purposefully required Aspen Ridge and other Southwest Developments to become obligated to install robust water and other infrastructure with capacity greatly in excess of that needed for development of the Southwest Developments and reasonably anticipated future development, which expenses could be financed through the creation of an

SSA, a municipal financing mechanism that would allow the owners of the Southwest Developments to pay for the infrastructure over time by the use of municipal bonds.

41.     Defendant EEI, the City's engineering consultant, was integral to this part of Defendants' scheme, as it engineered and designed the off-site utilities and infrastructure for the Southwest Developments and created the service areas and cost allocations for the SSA.

42.     In reality, Defendants' motivation in creating the Annexation Corridor was to allow Yorkville to gain immediate control over and host a landfill on the Hamman Farm Property.

43.     In addition, Wyeth and, on information and belief, Prochaska, instructed other Yorkville city officials (including, but not limited to the Yorkville Aldermen and Miller) to keep Yorkville's scheme to acquire control over the Hamman Farm Property and to host a landfill a secret until after the annexation of the Annexation Corridor, so as not to alert any property owners within the Annexation Corridor, including Aspen Ridge, of Defendants' intention to control and host a landfill on the Hamman Farm Property.

44.     The Defendants' intentional and material misrepresentations fraudulently induced Aspen Ridge to enter into the Annexation Agreement and resulted in the annexation of the Aspen Ridge Property into Yorkville under onerous terms.

**C.     <u>Defendants Provide Economic Advantages to Other Land Owners.</u>**

45.     In order to annex the Hamman Farm Property, the Defendants had to complete the Annexation Corridor by annexing certain additional properties.  In particular, Yorkville needed to annex the Borneman Farm, and the Schanze Property.  *See* Exhibit F, p. 2.

46.     The Borneman Farm was annexed under Ordinance No. 2006-106 and the Schanze Property was annexed under Ordinance No. 2006-112.

47.    These properties constitute the "Extended Annexation Corridor."

48.    None of the properties under the Extended Annexation Corridor was actively seeking annexation to Yorkville in 2006 or prior thereto.

49.    None of the properties in the Extended Annexation Corridor had any current plans for development to be submitted to Yorkville.

50.    The properties in the Extended Annexation Corridor were annexed into Yorkville with advantageous zoning and fee waivers.

51.    In addition, the properties in the Extended Annexation Corridor were not required to participate in the present construction and funding of the off-site utilities and infrastructure that were being required of and funded by the Southwest Developments but that would serve those properties.

## COUNT I

## DENIAL OF EQUAL PROTECTION OF THE LAW

52.    Aspen Ridge incorporates and realleges Paragraph 1 to 51 as and for paragraph 52 of this Count I, as if fully set forth herein.

53.    As part of the Annexation Agreement, Yorkville required Aspen Ridge to:

A.    Pay substantial fees and deposits for annexation and development; and

B.    Pay substantial fees for consulting services incurred by Yorkville, the costs of surveys, plats, the expenses for the services of the City attorney, the cost of required public notices, recording fees and the cost of engineering services.

54.    In connection with the annexation of property in the Extended Annexation Corridor (Borneman Farm and Schanze Property), Yorkville:

A.    Waived or deferred payment of all fees and deposits required for annexation and development;

B.    Assumed the expense for or waived the "normal fees or contributions" for the following:

1.    Yorkville assumed all expense for consultants' services, preparation of survey and plats, public notice publications, City attorneys' services, preparation of ordinances, and fees to record the annexation agreement, all exhibits and all required plats.

2.    Yorkville shall provide, at no expense to the owner, through its engineer or planner, an initial concept plan.

3.    Yorkville agreed to afford police protection, 911 services and library services at no cost to owner.

4.    Yorkville agreed to rebate all general Yorkville tax levy monies and Yorkville library tax levy monies.

5.    Yorkville waived all requirements under existing Yorkville ordinances that would compel owner to pay a filing fee for seeking annexation to Yorkville.  Yorkville waived all current and future annexation fees now or hereafter required under any Yorkville ordinance.

6.    Yorkville waived all requirements under Yorkville ordinances that would compel owner to pay any fee and/or to donate any land pursuant to the school district land cash ordinance and land cash ordinance for Yorkville park purposes.

7.      Yorkville waived payment of all school district land/cash ordinance fees and contributions, any and all park land/cash ordinance fees and contributions for the portion of the annexed property having a business classification.

8.      Yorkville waived all requirements under existing Yorkville ordinances that would compel owner to pay any Yorkville development fees and any Yorkville municipal building fees.

C.      Yorkville represented and warranted to the owners that the owners shall not, upon annexation of the Extended Annexation Corridor properties become liable to Yorkville or any third party for recapture costs for the installation of any sewer or water lines or storm water lines and/or storage facilities or other public improvements that become available to serve portions of the annexed property.

D.      Yorkville covenanted that no special assessment or special use district imposed by Yorkville shall be effective against portions of the annexed property without the owner's consent.

E.      Yorkville did not require portions of the annexed property to become immediately annexed to the Yorkville Bristol Sanitary District.

F.      Yorkville covenanted to the owners of the Borneman Farm Property that no present recapture would apply for connection to public utilities when Yorkville had knowledge it had submitted the Borneman Farm Property to recapture with respect to the Southwest Developments.

55.    The properties in the Extended Annexation Corridor were similarly situated to the property owned by Plaintiff.

56.    The owners of the properties in the Extended Annexation Corridor were *prima facie* identical in all relevant respects to Plaintiff.

57.    The Defendants intentionally treated Plaintiff differently from the owners of the property in the Extended Annexation Corridor.

58.    There was no rational basis for the disparate treatment that Defendants afforded Plaintiff when compared to the favorable and arbitrary treatment afforded the owners of the property in the Extended Annexation Corridor.

59.    The disparate treatment afforded Plaintiff by Defendants constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

60.    Defendants' disparate treatment of Plaintiff occurred under color of state law and caused damage to Plaintiff.

61.    Plaintiff is entitled to recover damages against Defendants for their wrongful acts pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiff, Aspen Ridge Estates, LLC, prays that this Court grant the following relief:

A.    Award compensatory damages to Plaintiff and against Defendants, jointly and severally, in an amount in excess of $12,000.000.

B.    Award punitive damages to Plaintiff and against Defendants, jointly and severally, in an amount in excess of $12,000.000.

C.    Award Plaintiff its attorneys' fees and costs pursuant to 42 U.S.C. § 1981.

D.    Award such other and further relief as this Court deems proper.

## COUNT II

## CIVIL RICO CLAIM

62.     Aspen Ridge incorporates and realleges paragraphs 1-51 as and for paragraph 63 of this Count II as if fully set forth herein.

63.     At all times relevant to this dispute the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("RICO"), was in effect and was applicable to the facts set forth in this Complaint.

64.     RICO prohibits, "Any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c).

65.     RICO permits businesses damaged by racketeering activities to have their cases heard in federal court and allows the aggrieved party to recover actual damages sustained, "three fold the damages he sustains and the cost of suit, including a reasonable attorney's fee. . . ." 18 U.S.C. § 1964(c).

66.     In August 2006, the Defendants used instrumentalities of interstate commerce, including, but not limited to, the telephone system as an integral part of its scheme to induce Aspen Ridge to annex the Aspen Ridge Property to Yorkville and to execute the Annexation Agreement attached to the Complaint as Exhibit B, including, but not limited to, the use of the telephone system to make fraudulent statements of material fact to Dresden as agent for Aspen Ridge on dozens of occasions. In many of these conversations, Dresden asked Defendants, including but not limited to Miller, what other properties the City was planning to annex. In

each case, Dresden was told that the City was not planning to annex any other properties other than those that were part of the Southwest Developments.

67.     Defendants' well documented pattern of fraudulent activities are in direct violation of 18 U.S.C. § 1343 prohibiting against wire fraud.  As such, Defendants' activities constitute "racketeering activities" under RICO.  *See* 18 U.S.C. § 1961(1)(B).

68.     Defendants, in their association to run the City of Yorkville government, qualify as an "enterprise" under RICO (the "Yorkville Enterprise"), *See* 18 U.S.C. § 1961(4). Defendants' pattern of using interstate wire facilities was a central component of its scheme to defraud Aspen Ridge to annex into the City of Yorkville so that the City could then annex the Hamman Farm Property and receive the tipping fees from the landfill to be operated on the Hamman Farm Property.

69.     Wyeth participated in the Yorkville Enterprise by formulating the scheme used to fraudulently induce Aspen Ridge to annex the Aspen Ridge Property to Yorkville and to execute the Annexation Agreement, as evidenced by, among other things, the Wyeth Memos.

70.     In addition, Wyeth made several phone calls and sent several emails to Aspen Ridge's attorneys pertaining to the annexation of Aspen Ridge in furtherance of the Yorkville Enterprise.  In these phone calls and emails, Wyeth continued the misrepresentations by failing to disclose the true facts pertaining to the Landfill Project.

71.     Wyeth reported to both Prochaska and the Yorkville Aldermen as part of the Yorkville Enterprise.

72.     Miller participated in the Yorkville Enterprise by assisting to "sell" the Enterprise's fraudulent scheme to induce Aspen Ridge to annex the Aspen Ridge Property to Yorkville and to execute the Annexation Agreement, by, among other things, expressly denying

that Yorkville planned to host a landfill on the Hamman Farm Property when questioned directly on the matter by Dresden and by advising Dresden, when asked, that no other properties were being considered for annexation when, in fact, the City was negotiating annexation agreements with Borneman Farm, the Schanze Property and the Hamman Farm Property, among others.

73.    In addition, Miller had several phone calls with Dresden wherein he made blatant misrepresentations in furtherance of the Yorkville Enterprise.

74.    Miller, reported to Prochaska and the Yorkville Aldermen as part of the Yorkville Enterprise.

75.    EEI participated in the Yorkville Enterprise as an agent hired by Yorkville to design the comprehensive infrastructure needed so that an SSA could be developed.  An SSA is a municipal financing devise for infrastructure development that the City offered as an inducement to get Aspen Ridge to agree to annexation.  EEI knew that the true purpose of the annexation of Aspen Ridge was to further the Landfill Project.  EEI concealed the true purpose of the Annexation Agreement and SSA from Aspen Ridge.

76.    EEI reported to Prochaska, Miller, Wyeth and the Yorkville Aldermen as part of the Yorkville Enterprise.

77.    Prochaska participated in the Yorkville Enterprise by helping to formulate and conceal the Enterprise's fraudulent scheme, and by voting for certain ordinances passed by Yorkville in furtherance of the Enterprise.

78.    Prochaska worked in conjunction with the Yorkville Aldermen as a leader of the Yorkville Enterprise.

79.    The Yorkville Aldermen participated in the Yorkville Enterprise by, among other things, passing the ordinances necessary to annex Aspen Ridge, the remainder of the Annexation Corridor, and the Hamman Farm Property into Yorkville and all other ordinances necessary to accomplish the goals of the Enterprise, without disclosing to Aspen Ridge prior to annexation the fact that the City had negotiated an agreement with the Developers of Hamman Farm to annex that property into the City for the purpose of hosting a landfill thereon that would pay large tipping fees to Yorkville.

80.    The Yorkville Aldermen worked in conjunction with Prochaska as leaders of the Yorkville Enterprise.

81.    Defendants were all either members or agents of the City of Yorkville government, and their participation in the Yorkville Enterprise was to the benefit of the Enterprise and the City of Yorkville.

WHEREFORE, Plaintiff, Aspen Ridge Estates, LLC, requests judgment be entered in its favor and against Defendants, Arthur F. Prochaska, Jr., John Justin Wyeth, James Bock, Dean Wolfer, Joseph Besco, Paul James, Marty Munns, Engineering Enterprises, Inc., and Travis Miller, jointly and severally, for violation of the Racketeering Influence and Corrupt Organizations Act and that this Court award it actual damages, treble damages, punitive damages, attorney's fees and costs, and such other additional relief this Court finds just and equitable.

## COUNT III

## FRAUDULENT MISREPRESENTATION AGAINST ALL DEFENDANTS

82.    Aspen Ridge incorporates and realleges paragraphs 1-51 as and for paragraph 82 of this Count III, as if fully set forth herein.

83.     As set forth above, Defendants knowingly made material misrepresentations of fact when they stated that they knew nothing of Yorkville's plan to annex and host a landfill on the Hamman Farm Property and when they said that no other properties were being considered for annexation.

84.     At the time Defendants made those misrepresentations, they were in the midst of planning to annex and host a landfill at the Hamman Farm Property.  Defendants then enacted a scheme to fraudulently induce Aspen Ridge to agree to the annexation of the Aspen Ridge Property.

85.     Defendants knew these statements were misleading and intended to conceal the fact that they were planning to annex and host a landfill on the Hamman Farm Property. Defendants statements were made with total disregard of the known negative impact their fraud would have on Plaintiff.

86.     Aspen Ridge relied on Defendants' misrepresentations in agreeing to the annexation of the Aspen Ridge Property into Yorkville.

87.     Aspen Ridge made a reasonable inquiry of Defendants regarding what was going on with a landfill on the Hamman Farm Property and whether other properties were being considered for annexation, at which time Defendants made their material misrepresentations.

88.     Had Defendants disclosed their plan to host a landfill on the Hamman Farm Property, or that the Hamman Farm Property, the Borneman Farm and the Schanze Property were going to be annexed to the City, Aspen Ridge would have refused to annex the Aspen Ridge Property under the Annexation Agreement.  Instead, Defendants materially misrepresented their plan to host a landfill on the Hamman Farm Property and to annex other properties, thereby defrauding Aspen Ridge and dramatically reducing the value of the Aspen Ridge Property.

89.    Defendants' acts were willful, wanton, and committed in reckless disregard for the rights and interests of Aspen Ridge.

WHEREFORE, Plaintiff, Aspen Ridge Estates, LLC, requests judgment be entered in its favor and against Defendants, jointly and severally, and that the Court award it actual damages, punitive damages, attorney's fees and costs, and whatever additional relief this Court finds just and equitable.

## COUNT IV

## FRAUDULENT CONCEALMENT AGAINST ALL DEFENDANTS

(in the alternative)

90.    Aspen Ridge incorporates and realleges paragraphs 82-89 as and for paragraph 90 of this Count IV, as if fully set forth herein.

91.    As set forth above, Defendants made material misrepresentations of fact when they stated that Yorkville had no plans to annex and host a landfill on the Hamman Farm Property and when they stated that no other properties were under consideration for annexation.

92.    In the alternative, to the extent any Defendant did not make a misrepresentation, that Defendant intentionally concealed misrepresentations of material fact made by one or more other Defendants.

93.    At the time Defendants concealed those misrepresentations, they were in the midst of planning to annex and host a landfill at the Hamman Farm Property and in annexing the Borneman Farm and Schanze Property.  Defendants then intentionally enacted a scheme to fraudulently induce Aspen Ridge to agree to the annexation of the Aspen Ridge Property to Yorkville.

94.     Defendants knew their statements were misleading and intended to conceal the fact that they were planning to annex other properties and host a landfill on the Hamman Farm Property.

95.     Aspen Ridge relied on Defendants' misrepresentations in agreeing to annex the Aspen Ridge Property into Yorkville.

96.     Aspen Ridge made a reasonable inquiry of Defendants regarding what was going on with a landfill on the Hamman Farm Property and whether other properties were being considered for annexation, at which time Defendants made their material misrepresentations.

97.     Had Defendants disclosed their plan to annex other properties and to host a landfill on the Hamman Farm Property, Aspen Ridge would have refused to annex the Aspen Ridge Property to Yorkville under the terms of the Annexation Agreement.  Instead, Defendants materially misrepresented and concealed their plan to annex other properties and to host a landfill on the Hamman Farm Property, thereby defrauding Aspen Ridge and dramatically reducing the value of the Aspen Ridge Property.

98.     Defendants' acts were willful, wanton, and committed in reckless disregard for the rights and interests of Aspen Ridge.

WHEREFORE, Plaintiff, Aspen Ridge Estates, LLC, requests judgment be entered in its favor and against Defendants, jointly and severally, and that this Court award it actual damages, punitive damages, attorney's fees and costs, and whatever additional relief this Court finds just and equitable.

## COUNT V

## CONSPIRACY AGAINST ALL DEFENDANTS

99.    Aspen Ridge incorporates and realleges paragraph 82 through 90 as paragraph 99 of this Count V, as if fully set forth herein.

100.    Defendants had an agreement to defraud Aspen Ridge and commit fraud by misrepresenting and/or concealing Yorkville's plan to annex other properties and to host a landfill on the Hamman Farm Property.  Defendants also committed the acts described herein in furtherance of that agreement.

101.    This agreement to commit unlawful acts has caused Aspen Ridge to incur substantial damages.

102.    The acts committed by Defendants in conspiring as set forth above were willful, wanton and committed in reckless disregard for the rights and interests of Aspen Ridge.

WHEREFORE, Plaintiff, Aspen Ridge Estates, LLC, requests judgment be entered in its favor and against Defendants, jointly and severally, and that the Court award it actual damages, attorney's fees and costs, punitive damages and whatever additional relief this Court finds just and equitable.

Plaintiff Demands Trial By Jury On Each Count.


Dated:  August 7, 2008                    Respectfully submitted,

                                          ASPEN RIDGE ESTATES, LLC


                                          By:   /s/ Leonard S. Shifflett
                                                One of Its Attorneys

Leonard S. Shifflett, Esq. (ARDC #2587432)
Robert L. Gamrath, Esq. (ARDC #6220315)
Anthony P. Steinike, Esq. (ARDC #6279857)
QUARLES & BRADY LLP
500 West Madison Street
Suite 3700
Chicago, Illinois 60661
Telephone:  (312) 715-5000
Facsimile:   (312) 715-5155

```
FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB
```

# EXHIBIT A

*LEGAL DESCRIPTION*

THAT PART OF SECTION 5 AND THAT PART OF THE EAST HALF OF SECTION 6, AND THAT PART OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF UNIT FIVE, FOXLAWN; THENCE NORTH 67 DEGREES 26 MINUTES 00 SECONDS EAST ALONG THE SOUTHERLY LINE OF UNIT FIVE, FOXLAWN 816.1 FEET TO THE SOUTHEASTERLY CORNER THEREOF; THENCE NORTH 67 DEGREES 20 MINUTES 16 SECONDS EAST ALONG A FENCE LINE 1473.92 FEET; THENCE SOUTH 16 DEGREES 21 MINUTES 28 SECONDS EAST ALONG A FENCE LINE 1537.61 FEET; THENCE SOUTH 16 DEGREES 28 MINUTES 31 SECONDS EAST ALONG A FENCE LINE 2,228.02 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF ILLINOIS STATE ROUTE NUMBER 71, THIS COURSE HEREINAFTER REFERRED TO AS LINE 'A'; THENCE WESTERLY ALONG SAID NORTHERLY RIGHT OF WAY LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5105.59 FEET, A DISTANCE OF 90.13 FEET TO A LINE DRAWN PARALLEL WITH AND 90 FEET WESTERLY OF, AS MEASURED AT RIGHT ANGLES TO, LINE 'A' AFORESAID; THENCE NORTH 16 DEGREES 28 MINUTES 31 SECONDS WEST ALONG SAID LINE DRAWN PARALLEL WITH LINE 'A' 484.93 FEET; THENCE SOUTH 72 DEGREES 05 MINUTES 18 SECONDS WEST 473.01 FEET; THENCE SOUTH 16 DEGREES 28 MINUTES 31 SECONDS EAST 272.84 FEET; THENCE SOUTH 32 DEGREES 41 MINUTES 01 SECONDS EAST 188.57 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF SAID ROUTE NUMBER 71; THENCE SOUTH 74 DEGREES 35 MINUTES 16 SECONDS WEST ALONG SAID NORTHERLY RIGHT OF WAY LINE 440.05 FEET TO THE SOUTHEASTERLY CORNER OF A TRACT OF LAND CONVEYED TO GEORGE C. BELL AND WIFE BY WARRANTY DEED RECORDED JANUARY 13, 1971 AS DOCUMENT 71-93; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG AN EASTERLY LINE OF SAID BELL TRACT 240 FEET TO AN ANGLE IN SAID EASTERLY LINE; THENCE NORTH 74 DEGREES 42 MINUTES 30 SECONDS EAST 100 FEET; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST 360 FEET; THENCE SOUTH 74 DEGREES 42 MINUTES 30 SECONDS WEST 371 FEET; THENCE SOUTH 18 DEGREES 07 MINUTES 30 SECONDS EAST 182 FEET; THENCE SOUTH 74 DEGREES 47 MINUTES 30 SECONDS WEST 418 FEET TO THE EASTERLY LINE OF A TRACT OF LAND CONVEYED TO MERVIN J. WISSMILLER AND WIFE BY WARRANTY DEED RECORDED APRIL 30, 1974 AS DOCUMENT 74-1947; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG SAID EASTERLY LINE 576.02 FEET TO THE NORTHEAST CORNER OF SAID WISSMILLER TRACT; THENCE SOUTH 72 DEGREES 23 MINUTES 49 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID TRACT 720.25 FEET; THENCE NORTH 13 DEGREES 56 MINUTES 14 SECONDS WEST 2495.06 FEET TO THE POINT OF BEGINNING, (EXCEPT THAT PART OF THE SOUTHWEST QUARTER OF SECTION 5, AND THAT PART OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 5; THENCE EASTERLY ALONG THE SOUTH LINE OF SAID SECTION 5, 362.34 FEET; THENCE NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST 189.5 FEET TO THE NORTH LINE OF ILLINOIS STATE ROUTE NUMBER 71; THENCE WESTERLY ALONG SAID NORTH LINE TO A POINT WHICH IS 90.0 FEET NORMALLY DISTANT WESTERLY OF THE LAST DESCRIBED COURSE; THENCE WESTERLY ALONG SAID NORTH LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5,105.59 FEET, 191.17 FEET; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 117.50 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 112.0 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 36.76 FEET TO AN ANGLE POINT IN SAD NORTH LINE; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 278.0 FEET FOR THE POINT OF BEGINNING; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE, 125.59 FEET TO THE SOUTHEASTERLY CORNER OF A TRACT OF LAND CONVEYED TO GEORGE C. BELL, AND HIS WIFE BY WARRANTY DEED RECORDED JANUARY 13, 1971 AS DOCUMENT 71-93; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG AN EASTERLY LINE OF SAID BELL TRACT, 240 FEET TO AN ANGLE IN SAID EASTERLY LINE; THENCE NORTH 74 DEGREES 42 MINUTES 30 SECONDS EAST TO A LINE DRAWN NORTHWESTERLY FROM, AS MEASURED AT RIGHT ANGLES TO THE NORTHERLY LINE OF SAID ROUTE 71, FROM THE POINT OF BEGINNING; THENCE SOUTHEASTERLY ALONG SAID LINE TO THE POINT OF BEGINNING; AND ALSO EXCEPT THAT PART OF THE SOUTH HALF OF SECTION 5, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 5; THENCE EASTERLY ALONG THE SOUTH LINE OF SAID SECTION 5, 362.34 FEET; THENCE NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST 189.5 FEET TO THE NORTH LINE OF ILLINOIS STATE ROUTE NUMBER 71; THENCE WESTERLY ALONG SAID NORTH LINE TO A POINT WHICH IS 90.0 FEET NORMALLY DISTANT WESTERLY OF THE LAST DESCRIBED COURSE; THENCE WESTERLY ALONG SAID NORTH LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5,105.59 FEET, 191.17 FEET; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 117.50 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 112.0 FEET; THENCE NORTH 30 DEGREES 36 MINUTES 39 SECONDS WEST 188.57 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 30 DEGREES 36 MINUTES 39 SECONDS EAST 188.57 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 36.76 FEET TO AN ANGLE POINT IN SAID NORTH LINE; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 278.0 FEET; THENCE NORTHWESTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE 300.0 FEET; THENCE NORTHEASTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE 259.40 FEET TO A LINE DRAWN NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST FROM THE POINT OF BEGINNING; THENCE SOUTH 14 DEGREES 17 MINUTES 11 SECONDS EAST 123.25 FEET TO THE POINT OF BEGINNING) IN THE TOWNSHIP OF KENDALL, KENDALL COUNTY, ILLINOIS.

FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB

# EXHIBIT B

STATE OF ILLINOIS     )
                               ) SS

COUNTY OF KENDALL  )

## ANNEXATION AGREEMENT
## ASPEN RIDGE ESTATES

    This Annexation Agreement (hereinafter "**Agreement**"), is made and entered into this *8th* day of *August*, 2006, by and between the UNITED CITY OF YORKVILLE, an Illinois municipal corporation, (hereinafter referred to as the "**CITY**"), and ASPEN RIDGE ESTATES, L.L.C., the owner of record of the subject property, (hereinafter referred to as the "**OWNER**").

## WITNESSETH

    WHEREAS, the OWNER owns fee simple title to the real property which is legally described in **Exhibit "A"** attached hereto, consisting of approximately 126 acres, more or less (hereinafter the "**PROPERTY**") which is located at the southwest corner of Fox and Pavillion Roads; and

    WHEREAS, the PROPERTY is located in an unincorporated area of Kendall County and is contiguous to the corporate limits of the City; and

    WHEREAS, there are no electors residing on the PROPERTY; and

    WHEREAS, the OWNER desires to provide for the annexation of the PROPERTY and to develop the PROPERTY in the CITY in accordance with the terms of this Agreement and the Ordinances of the CITY; and

    WHEREAS, it is the desire of the CITY to annex the PROPERTY and to grant zoning and facilitate its development pursuant to the terms and conditions of this Agreement and the Ordinances of the CITY; and

    WHEREAS, the OWNER and the CITY have or will perform and execute all acts required by law to effectuate such annexation; and

    WHEREAS, all notices required by law relating to the annexation of the PROPERTY to the CITY have been given to the persons or entities entitled thereto, pursuant to the applicable provisions of the Illinois Compiled Statutes; and

    WHEREAS, the Corporate Authorities and the Plan Commission of the CITY have duly held all public hearings relating to annexation, zoning and subdivision all as required by the provisions of the CITY'S Ordinances and Illinois Compiled Statutes; and

    WHEREAS, the Corporate Authorities of the CITY have duly fixed the time for a public hearing on this Agreement and pursuant to legal notice have held such hearing thereon all as required by the provisions of the Illinois Compiled Statues; and

WHEREAS, the OWNER and the CITY agree that upon annexation to the CITY the PROPERTY shall be zoned R-2 Single Family Residence District and the CITY shall grant certain deviations from the City of Yorkville Subdivision Ordinance necessary for the contemplated development of the PROPERTY; and

WHEREAS, in reliance upon the development of the PROPERTY in the manner proposed, the OWNER and the CITY have agreed to execute and deliver all petitions, give all notices, and enact all such resolutions and ordinances and provide and record all other documents that are necessary to accomplish the annexation of the PROPERTY to the CITY; and

WHEREAS, in accordance with the powers granted to the CITY by the provisions of 65 ILCS 5/11-15.1-1 through 15.1-5, inclusive, relating to annexation agreements, the parties hereto wish to enter into a binding agreement to govern the annexation, zoning, subdivision and development of the PROPERTY, and the performance of certain undertakings which are contingent upon said annexation, zoning and subdivision and to provide for various other matters related to the annexation of the PROPERTY in the future, as authorized by the provisions of said statutes; and

WHEREAS, the Corporate Authorities, after due and careful review, have concluded that the annexation of the PROPERTY to the CITY and the zoning and development of the PROPERTY on the terms and conditions hereinafter set forth will (i) further the planned growth of the CITY; (ii) increase the tax base of the PROPERTY lying within the City; and (iii) generally benefit the CITY and enhance and promote the general welfare of the CITY;

WHEREAS, by a two-thirds (2/3) vote of the Corporate Authorities then holding office, the CITY has duly adopted an ordinance approving the terms and provisions of this Agreement (the "**Approval Ordinance**") and authorizing and directing the Mayor to execute and the City Clerk to attest to this Agreement on behalf of the CITY; and

WHEREAS, each of the parties is materially changing its respective position in reliance upon the execution of this Agreement by the other parties and the performance by the other parties of their respective undertakings contained herein.

NOW, THEREFORE, in consideration of the foregoing preambles and the mutual covenants, agreements and conditions herein contained, and by authority of and in accordance with the aforesaid statutes of the State of Illinois, THE PARTIES AGREE AS FOLLOWS:

## 1.    ANNEXATION.

The OWNER has filed a duly and properly executed petition pursuant to 65 ILCS 5/7-1-8 for annexation of the PROPERTY to the United City of Yorkville. After adoption of the Approval Ordinance and execution of this Agreement, and at the same meeting, the CITY shall adopt, and the Mayor and City Clerk shall sign and attest, an ordinance (the "**Annexation Ordinance**") annexing the PROPERTY and all unincorporated contiguous right of way to the City.

2.    **ZONING.**

Immediately after adoption of the Annexation Ordinance, and at the same meeting and in accordance with the United City of Yorkville Zoning Ordinance, the Corporate Authorities shall adopt, and the Mayor and City Clerk shall sign and attest, an ordinance (the "**Zoning Ordinance**") which shall classify the PROPERTY in the R-2 Single Family Residence Zoning District effective immediately upon the recording of the Annexation Ordinance and the plat of annexation.

3.    **DEVELOPMENT OF THE PROPERTY**

A.    Approval of Preliminary Plat of Subdivision and Preliminary Engineering Plans. Immediately after adoption of the **Zoning Ordinance**, and at the same meeting, the Corporate Authorities shall adopt an ordinance or resolution approving the preliminary subdivision plat and preliminary engineering plans and preliminary landscape plan referenced herein and made a part hereof (the "**Preliminary Plans**"), subject to addressing all of Engineering Enterprises, Inc.'s comments prepared May 3, 2005 and Schoppe Design Associates' comments prepared May 4, 2005, copies of which are attached as exhibits hereto:

1.    Preliminary Plat (3 sheets), prepared by Smith Engineering Consultants, Inc., dated January 24, 2005 and dated as last revised April 21, 2005 (**Exhibit "B"**);

2.    Preliminary Engineering Plan (3 sheets), prepared by Smith Engineering Consultants, Inc., dated January 24, 2005 and dated as last revised April 21, 2005 (**Exhibit "C"**);

3.    Landscape Plan (3 sheets), prepared by Ives/Ryan Group, dated January 24, 2005 and dated as last revised July 5, 2006 (**Exhibit "D"**).

B.    General Rights and Obligations. The OWNER shall have the right to develop the PROPERTY in accordance with, and only in accordance with: (i) final plats of subdivision and final engineering plans to be approved by the CITY in accordance with this Agreement and the City Code; (ii) this Agreement; (iii) the Zoning Ordinance; (iv) the Preliminary Plans; and (v) any other document relative to the development of the PROPERTY that is required and approved by the CITY (collectively, the "**Approved Documents**"). In the event of a conflict between the Approved Documents and the City Code, the Approved Documents shall control.

4.    **ANNEXATION TO SANITARY DISTRICT.**

The OWNER agrees to file any necessary petitions and agreements to request annexation and/or sanitary sewer service for the PROPERTY from the Yorkville Bristol Sanitary District ("**YBSD**") for the purpose of extending and connecting to the sanitary sewer lines and treatment facilities of YBSD. The CITY shall fully cooperate with the OWNER in obtaining such permits as may be required from time to time by both federal and state law, including, without limitation, the Illinois Environmental Protection Act, permitting the construction and connection of the sanitary sewer lines to the YBSD facilities, in order to facilitate the development and use of the PROPERTY.

5.    **FINAL PLAT AND PLANS.**

The CITY acknowledges receipt of an application for approval of a final plat of subdivision and final engineering plans (collectively, "**Final Plan**") for the PROPERTY. The CITY shall adopt within sixty (60) days from the Date of this Agreement an ordinance or resolution, to be executed by the Mayor and attested by the City Clerk, approving the Final Plan so long as the Final Plan substantially conforms to the approved Preliminary Plan. If the CITY determines the Final Plan is not in substantial conformance with the Preliminary Plan, it shall provide written notice to OWNER of all such non-conformities within thirty (30) days from the Date of this Agreement. OWNER shall resubmit a revised Final Plan addressing the non-conformities identified by the CITY and the CITY shall approve the resubmitted Final Plan within thirty (30) days of its receipt.

OWNER may develop the PROPERTY in a maximum of three (3) phases provided that any individual phase contains a minimum of twenty-five (25) lots. Public improvements for an individual phase will be constructed in accordance with the portion of the Final Plan applicable to such phase. The first phase of development shall be as depicted on the phasing plan attached as **Exhibit "E"** and the on-site improvements for such phase shall be constructed in accordance with the approved final engineering applicable to said phase. The required public improvements for the first phase of development shall be completed within four (4) years from the date of approval of the Final Plan. The second phase of development shall commence within two (2) years after completion of the first phase of development. The public improvements to be completed in the second phase of development shall be completed within two (2) years from the date of commencement of the second phase of development. The third phase of development shall commence within two (2) years after completion of the second phase of development. The public improvements to be completed in the third phase of development shall be completed within two (2) years from the date of commencement of the third phase of development. OWNER, at its sole option, may proceed with development of the PROPERTY on a shorter schedule than that set forth above.

6.    **SANITARY SEWER AND WATER IMPROVEMENTS.**

A.    <u>Owner's Obligation</u>. At its cost, the OWNER shall construct all on-site sanitary sewer collection lines and all other on-site improvements contained in the approved Final Plan for the collection of sanitary sewage generated by the PROPERTY (the "**Sewer Improvements**") and all on-site water mains, distribution lines, and other improvements contained in the approved Final Plan for the provision of potable water to the PROPERTY (the "**Water Improvements**"), in accordance with City Code and in phases as OWNER may choose pursuant to this Agreement. Notwithstanding the foregoing, the CITY has identified the potential need for a well and water treatment facility to be located on the PROPERTY. Should the CITY determine that such a well and water treatment facility is required, the project shall be considered an off-site improvement to be performed by the CITY and to be financed by the proceeds of Revenue Bonds or Special Tax of the SSA. The location of the well and water treatment facility shall be limited to Lot 221 of the Preliminary Plat of Subdivision. OWNER shall dedicate to CITY and CITY shall accept dedication of Lot 221 prior to commencement of any work on the well and water treatment facility.

B.    Dedication.  Upon completion of construction or installation of the Sewer Improvements and Water Improvements, the OWNER shall dedicate to the CITY those portions of the Sewer Improvements and Water Improvements that are required to be dedicated in accordance with the City Code (the "**Public Sewer and Water Improvements**").  The CITY shall promptly accept the dedication of the Public Sewer and Water Improvements in accordance with the procedures set forth below under the section entitled Procedure for Acceptance of Public Improvements and thereafter shall assume responsibility for all maintenance, repair and replacement thereof, in accordance with City Code.  Dedication of the Sewer Improvements and Water Improvements may occur independently or collectively, as determined by OWNER.

## 7.    STORM WATER IMPROVEMENTS

A.    Owner's Obligation.  At its cost, the OWNER shall construct all storm sewers, detentions systems, and compensatory storage facilities contained in the approved Final Plan for storm water drainage from the PROPERTY ("**Storm Water Improvements**") in accordance with the City Code and in phases as OWNER may choose pursuant to this Agreement.

B.    Dedication.  All Storm Water Improvements shall be owned and maintained by the OWNER or a homeowner's association.  The OWNER shall dedicate a maintenance easement or easements to the CITY allowing the CITY to maintain the Storm Water Improvements if the OWNER or homeowner's association fails to maintain them

C.    City Cooperation.  The CITY shall cooperate with the OWNER, at no cost to the OWNER for out-of-pocket expenses, and execute all applications, permit requests, and other documents necessary or desirable to obtain storm water approvals from any other governmental agency.  The CITY shall not be entitled to compensation for its time and services associated with assistance obtaining storm water approvals.

## 8.    HOMEOWNER ASSOCIATION; DORMANT SPECIAL SERVICE AREA

A.    The OWNER shall establish a homeowners association ("**Association**") of all lot owners within the PROPERTY and a mandatory membership of all lot owners in the Association.  The Association shall be established by a Declaration of Covenants, Conditions, Restrictions and Easements recorded against all of the PROPERTY other than those areas and improvements within the PROPERTY that may be dedicated to and accepted by the CITY.  The Association shall have the primary responsibility and duty to carry out and pay for maintenance of any storm water detention and retention facilities, drainage ways in easements, wetlands, open space, subdivision signage, landscaping and pavement areas, any of which are not dedicated to and accepted by the CITY or other governmental agency and are not located within building lots, (collectively, "**Common Facilities**"), through assessments levied against all dwelling units within the PROPERTY.  The Association shall be responsible for the regular care, maintenance, renewal and replacement of the Common Facilities including storm water detention areas and without limitation, the mowing and fertilizing of grass, pruning and trimming of trees and bushes, removal and replacement of diseased or dead landscape materials, and the repair and replacement of fences and monument signs, so as to keep the same in a clean, sightly and first-class condition, and shall utilize the Association to provide sufficient funds to defray the cost of such maintenance and to establish reserve funds for future repairs and replacements.  The

OWNER shall convey to the Association all of the OWNER'S right, title and interest in and to all Common Facilities established on the PROPERTY as and when provided for in the declaration. These shall include all storm water management facilities depicted on the Preliminary Engineering Plan, as constructed pursuant to the subsequently approved final engineering plans.

B.    The OWNER agrees and shall consent to the CITY, at its sole cost and expense, enacting at the time of final plat approval, or at such other time as the CITY deems necessary, a Dormant Special Service Area to act as a back up in the event that the Association fails to reconstruct, repair and maintain the Common Facilities. A maintenance easement for the benefit of the CITY shall be established over all of the Common Facilities located on the Final Plans.

9.    **ESTABLISHMENT OF SPECIAL SERVICE AREA AS PRIMARY FUNDING MECHANISM FOR INSTALLATION OF PUBLIC IMPROVEMENTS.**

Subject to the opt-out provision set forth below, the CITY and OWNER agree to participate with the other owners and/or developers (collectively, "**OWNERS**") of the property within the area generally referred to as the "Southwest Infrastructure Development" described in Section 10 below to establish a special service area ("**SSA**") as a primary funding mechanism for installation of on-site and off-site public improvements, including, without limitation, potable water, fire flow and/or water storage facilities, roads, storm water facilities (i.e., storm water sewers, collection and conveyance improvements, detention ponds if they benefit off-site properties), sanitary sewer facilities and other public improvements.

OWNER shall have the right to opt-out of participating in the SSA by providing written notice to the CITY of its intention to independently fund OWNER'S pro rata share of the infrastructure improvement costs as set forth on **Exhibit "AAA-2"**. Written notice of OWNER'S intent to opt-out of the SSA must be provided in accordance with the Notice provisions of this Agreement and by thirty (30) days prior to (i) January 15, 2007, or (ii) actual issuance of the bond(s), whichever is later. OWNER will pay its pro rata share of the costs no later than the date of the bond issuance in readily available funds. OWNER'S failure to provide notice within the required time period shall be deemed to be its consent to participate in the SSA.

The CITY and OWNER shall cooperate in good faith to identify and agree on the maximum amount to be financed and the appropriate structure for the financing, which the CITY and OWNERS currently believe will consist of one or more SSAs pursuant to 35 ILCS 200/27-5 et seq., but which may be authorized and implemented under other legal frameworks acceptable to the CITY and OWNERS. However, CITY and OWNERS hereby expressly agree that the form of Special Tax or other Revenue Bond shall be the form of bond which requires a payment at the time of sale of a developed lot, or the time of issuance of a building permit, otherwise known as the "pay down" bond. A draft bond term sheet including the average estimated special tax payments are attached as Exhibit "FFF".

The burden of the assessment is limited to and shall burden only those properties generally referred to as the "Southwest Infrastructure Developments" described in Section 10 of this Agreement and any other properties joining in the SSA.

10.    **CROSS CONTINGENCIES FOR INFRASTRUCTURE IMPROVEMENTS INCLUDING GREENBRIAR ROAD EXTENTION (SOUTHWEST INFRASTRUCTURE DEVELOPMENTS)**

A.    Cross Contingencies.    OWNER and CITY agree that enforceability of this agreement shall be contingent upon the CITY's approval of annexations for all five (5) developments commonly referred to as the "Southwest Infrastructure Developments." A list of the developments and the funding required on behalf of each of the developments is attached hereto as **Exhibit "AAA"**. These developments are related in that they all will derive special benefit from infrastructure improvements to be financed through the issuance of Special Revenue Bond(s) payable from special taxes levied in one or more special service areas to fund the extension of infrastructure to and through the developments. Nothing contained herein shall be construed as creating joint liability between the OWNERS for another OWNER'S economic or performance obligations.

B.    SSA Funding.    Upon execution of annexation agreements by the OWNERS for each of the Southwest Infrastructure Developments, CITY and OWNERS agree to establish individual Special Service Areas (SSAs) within each of the developments listed on **Exhibit "AAA"**. CITY shall then take action to issue Special Revenue Bonds by January 15, 2007 in an amount sufficient to fund the infrastructure extension, otherwise OWNER shall pay the fees set forth on **Exhibit "F"** necessary to proceed with its individual development. Upon payment of the above fees CITY will issue building permits for construction of on-site improvements and the CITY will permit OWNER to commence and complete those off-site improvements as shown on **Exhibit "G"**. In the event OWNER proceeds with its individual development pursuant to the provisions of this paragraph, the CITY shall obtain all easements, rights-of-way, permits, licenses, consents and approvals necessary to construct the off-site improvements required for OWNER'S individual development in accordance with the CITY'S obligation in "C" below.

The formation of the SSAs and issuance of Special Revenue Bonds is intended to render the following results:

1.    All areas will be within the SSAs, and all real property will become subject to the Special Tax. It is anticipated that each development will enact an individual SSA, and that all SSAs will issue one mutual Special Tax Bond for payments of the improvements.

2.    The special tax shall be available to fund the repayment of up to $_____ (this will be the pro rata amount owed by this development) in special tax bonds.

3.    The special tax revenue bonds shall be used to construct the infrastructure described on **Exhibit "AAA"** ("**Southwest Infrastructure**").

C.    CITY'S Obligation to Obtain Easements and Rights-of-Way.    The CITY shall obtain or acquire all necessary rights-of-way, easements, permits, licenses, consents and approvals required for construction of the Southwest Infrastructure. The CITY agrees that in the event it is unable to obtain any easements or rights-of-way necessary for construction of the Southwest Infrastructure, the CITY shall use its power of eminent domain, including quick take powers, to condemn such easements or rights-of-way.

D.    Cost Containment, Overruns.  In order to reduce the risk of cost overruns, OWNERS agree that the amount of bonds sold should not be determined until bids have been received by the City for construction of the Southwest Infrastructure. All contracts for work, other than engineering services to be performed by Engineering Enterprises, Inc. ("EEI") and Walter E. Deuchler Associates, Inc. ("WEDA"), performed in conjunction with the construction of the Southwest Infrastructure shall be deemed to be Public Improvement Contracts pursuant to Section 1-7-3 of the Yorkville City Code and shall be subject to the competitive, sealed bidding requirements of subsection C.1.-2. of Section 1-7-03. Since final engineering must be complete prior to seeking bids, OWNERS agree to front fund within thirty (30) days from the Date of Execution of this Agreement the amount indicated on **Exhibit "BBB"** for final engineering and to receive reimbursement for said sum from the sale of the Revenue Bonds; provided, OWNER shall receive no reimbursement in the event it exercises its right to opt-out under Section 9. OWNERS shall be allowed to comment regarding the determination of the amount of bonds sold, and the amount of contingency for cost overruns.  CITY will respond in writing to all OWNER comments and provide written documentation and justification of said overruns. All OWNERS shall be responsible for contribution, based upon the same ratios and rationale used in **Exhibit "AAA"** if the cost to complete the Southwest Infrastructure exceeds the amount of the Bonds, up to a collective amount not to exceed one Million Dollars ($1,000,000.00). The CITY further agrees to proceed with the engineering, site selection and acquisition, easement negotiation, design, agency review, bidding and contracting, construction and sampling and testing for completion of the Southwest Infrastructure in accordance with the schedule attached as **Exhibit "CCC"**. Should CITY fail to timely complete any stage of development as set forth in **Exhibit "CCC"**, OWNERS shall have the right, but not the obligation, to take over the project or any portion thereof and complete such project.

E.    Proceeds Of Bonds To Be Used To Extend Green Briar Drive.  OWNERS agree that traffic ultimately originating from this development, as well as all "Southwest Infrastructure Developments" will give rise to a need for the Green Briar Drive extension to Pavilion Road. One of the first uses or the Special Tax Bonds shall be the acquisition of right-of-way for the Green Briar Drive Extension. The CITY deems the construction of Green Briar Drive as a high priority and agrees to proceed with construction at its sole cost and expense as soon as funding is available. In addition, OWNERS agree to use their best efforts to route all construction vehicles in excess of eight (8) tons along state Route 71 to Pavillion or High Point Road and then to the development, and not allow such construction vehicles to travel along Fox Road from Rt 47 to the development. Each OWNER's obligation as to routing of construction traffic shall be only as to those construction vehicles under the direct supervision or control of said OWNER or as have been hired by said OWNER.

F.    Pavilion Road Improvements.

i.    In conjunction with the Southwest Infrastructure Developments, Pavilion Road is to be reconfigured and widened and its intersection with Foxfield Drive is to be improved as more fully depicted on **Exhibit "H"**. The improvements depicted in **Exhibit "H"** are a project to be conducted by the CITY and financed with proceeds from the Revenue Bonds or Special Tax of the SSA. OWNER shall have no obligation with respect to said improvements other than its monetary obligation set forth on **Exhibit "AAA-4"**.

ii.    The CITY hereby covenants that use of the existing right-of-way for Pavilion Road shall be limited to open space, trails, future roadway and similar purposes but that no buildings, maintenance facilities or other similar structures shall be constructed or permitted within said existing right-of-way. The CITY further agrees that it will restore any portion of Pavilion Road no longer used as a road to a natural state (e.g., graded and seeded for grass) at the time the improvements depicted on **Exhibit "H"** are constructed.

G.    <u>Recovery of Infrastructure Improvement Costs.</u> The CITY is requiring OWNER to pay additional fees to fund the cost of certain municipal improvements that provide regional and citywide benefits. The CITY shall enter into an agreement with OWNER providing for the recovery ("**Rebate Agreement**") by OWNER of the additional cost of such municipal improvements. The CITY shall provide for such recovery to OWNER from the Water Connection and Sanitary Sewer Connection Fees ("**Rebate Fees**") (or any other fee the CITY adopts to replace or supplement the Rebate Fees) it collects in conjunction with the development of any property depicted in **Exhibit "DDD"**, excluding the Southwest Infrastructure Developments. The Rebate Agreement shall be substantially in the form as attached hereto and made a part hereof as **Exhibit "EEE"**. In addition, the CITY recognizes that DEVELOPER is being required to construct a sixteen inch (16") sanitary sewer main through its property even though an eight inch (8") sanitary sewer main is all that is necessary to serve the property, in order to provide sanitary sewer service to the "Chally Farm" and "Yorkwood Estates" developments as depicted on **Exhibit "I"**. The CITY shall require Chally Farm and Yorkwood Estates to tap on to the sanitary sewer main being constructed by DEVELOPER but only upon confirmation by DEVELOPER that it has received reimbursement from the OWNER of all or any portion of the Chally Farm/Yorkwood Estates properties prior to tap-on. The CITY shall notify DEVELOPER upon receipt of a request for the Chally Farm and/or Yorkwood Estates properties to tap on to said sanitary sewer main and DEVELOPER shall confirm if it has received repayment from the owner of Chally Farm/Yorkwood Estates for the difference in cost of a 16" and 8" sanitary sewer main.

## 11.    SECURITY INSTRUMENTS.

As required by City Code, the OWNER shall deposit, or cause to be deposited, with the CITY such irrevocable letters of credit or surety bonds ("**Security Instruments**") on the standard forms of the City, to guarantee completion and maintenance of the **Land Improvements** (as defined in the Yorkville Subdivision Control Ordinance) to be constructed as a part of an individual phase of development of the PROPERTY. The OWNER may use either irrevocable letters of credit or surety bonds for its Security Instruments, as permitted by State law. The amount and duration of each Security Instrument shall be as required by applicable ordinances of the CITY at the time of execution of this Agreement, except as modified in this Agreement. OWNER shall submit the Security Instruments for on-site improvements for an individual phase of development no later than thirty (30) days after the pre-construction meeting with CITY representatives and City Engineer as required by the Yorkville City Code. OWNER may submit to the CITY a request for reduction of the Security Instruments not more than once every 30 days. The City Council, upon recommendation by the City Engineer, shall approve a reduction or reductions in the Security Instruments by an amount not in excess of ninety percent (90%) of the value of the completed work certified by the City Engineer, so long as the balance remaining in the Security Instruments is ten percent (10%) of the estimated total cost of the Land

Improvements. If a request for reduction of the Security Instruments is denied, the CITY shall provide OWNER with a single written notice of all reasons for denial within fourteen (14) days of receipt of a particular request for reduction. CITY shall approve the reduction in the Security Instruments upon OWNER'S compliance with the items listed in the CITY'S letter of denial.

12.    **PROCEDURE FOR ACCEPTANCE OF PUBLIC IMPROVEMENTS.**

The public Land Improvements constructed as a part of the development of the PROPERTY shall be accepted by the CITY pursuant to the provisions of the Subdivision Control Ordinance, except as modified by this Agreement. The City shall exercise good faith and due diligence in accepting public Land Improvements following the OWNER'S completion thereof in compliance with the requirements of said ordinance; and the City Engineer shall make a recommendation not later than thirty (30) days from the date of the OWNER'S request for approval of any Land Improvements. OWNER shall be entitled to submit to the CITY for acceptance of Land Improvements in phases upon the completion of a particular system or improvement (i.e., water distribution system, sanitary sewer system, streets, sidewalks, and street lighting, mass grading, landscaping) within any individual phase of development. Upon acceptance of a particular improvement by the CITY, and dedication of said improvement to the CITY, the portion of the Security Instrument for such improvement shall be reduced to zero and OWNER shall provide a Maintenance Bond (as defined in the Yorkville Subdivision Control Ordinance) in an amount equal to 10% of the particular Land Improvement. The term of the Maintenance Bond shall be for a period of one (1) year.

13.    **OVERSIZING.**

A.    In the event the OWNER proceeds with its individual development pursuant to the provisions of Section "10.B." and is required as a condition of final plat or engineering plan approval to oversize water mains, sanitary sewer mains, storm sewer lines, public roads, traffic signals or other improvements that benefit other properties, the OWNER and CITY shall enter into a written agreement specifically providing that the costs of such oversizing or additional improvements be reimbursed by the CITY, or be the subject of a recapture agreement and recapture ordinance in favor of the OWNER. The CITY agrees to require anyone intending to connect to or use said oversized or additional facilities to pay the CITY prior to or concurrent with annexation, final plat of subdivision or issuance of a building permit. All identified properties benefiting from the oversized or additional facilities will be required to participate in the recapture. In no event will connections be permitted to these facilities prior to meeting the recapture obligation. The CITY then shall promptly reimburse the OWNER within 30 days of collecting any such payment for the OWNER'S costs of oversizing said lines including costs for deepening said lines. In the event the OWNER seeks said reimbursement, the parties agree separately that the Recapture Agreement shall be executed pursuant to and in compliance, with the Illinois Compiled Statutes, Local Government Act governing recapture with the requisite public hearing being held and requisite recapture ordinance being approved by the City Council contingent on the percentage of the benefit to the OWNER and including the service area effected.

B.    OWNER agrees to hold the CITY harmless and indemnify the CITY from any liability as a result of any recapture imposed.

C.      Except as otherwise expressly provided in this Agreement, the CITY represents and warrants that there are currently no recapture agreements or recapture ordinances affecting public utilities which will be utilized to service the PROPERTY which the CITY has any knowledge of or under which the CITY is or will be required to collect recapture amounts from the OWNER or its successors, upon annexation or final plat of the PROPERTY or connection of the PROPERTY to any of such public utilities, nor does the CITY have any knowledge of a pending or contemplated request for approval of any such recapture agreement or ordinance which will effect the PROPERTY.

## 14.   PROJECT SIGNS.

A.      On-Site Signage.  For so long as the OWNER is actively marketing the development, the OWNER shall have the right to install on the PROPERTY, subject to its receipt of plan approval from the City Administrator, and, once installed, the right and obligation to maintain: (i) two (2) double-faced advertising signs that are eight feet by sixteen feet (8' x 16') at the following locations: one (1) along Fox Road; one (1) along Pavillion Road; (ii) not more than one sign on each lot measuring no more than 2' x 3'; and (iii) informational and directional signs on the PROPERTY.  The signage permitted hereunder shall be located with regard to proper sight distance to adjacent roadways as provided for in the City Code.  The OWNER shall promptly remove signs marketing the sale of dwelling units within the PROPERTY after it has ceased marketing such dwelling units.  Immediately after the Effective Date, the OWNER shall be permitted to make application for and receive plan approvals for the double-faced advertising signs (as specified in (i) above) to be located on the PROPERTY.

The OWNER shall have the right to install, subject to its receipt of plan approval from the City Administrator (unless previously approved as part of the Final Plan) ground illuminated entrance monuments both at the Fox Road and Pavillion Road entrances to the PROPERTY. Entrance monuments shall be constructed in substantial conformance with the Preliminary Plans. All entrance monuments, and any associated landscaping, shall be maintained by the Association pursuant to the terms of the declaration of covenants.  All entrance monuments shall be sited in a manner that ensures proper sight distance to adjacent roadways in accordance with City Code. No entrance monuments shall be located in public right-of-ways or roadway easements and each monument shall have adequate separation from underground utilities.

All other signage installed and maintained within the PROPERTY shall comply with the zoning and subdivision control ordinances of the CITY.  The Corporate Authorities, by majority vote and without further public hearing or amendment to this Agreement, may approve modifications to the signage provisions contained in this Section provided the same have been specifically requested by the OWNER.

B.      Off-Site Signage.  Following the date of this Agreement and through the date of the issuance of the final occupancy permit for the PROPERTY, OWNER shall be entitled to construct, maintain and utilize offsite subdivision identification, marketing and location signs at such locations within the corporate limits of the CITY as OWNER may designate (individually an "**Offsite Sign**" and collectively the "**Offsite Signs**") subject to sign permit review and issuance by the CITY.  OWNER shall be responsible, at its expense, for obtaining all necessary

and appropriate legal rights for the construction and use of each of the Offsite Signs. Each Offsite sign may be illuminated subject to approval by the CITY.

## 15.    BUILDING AND CONSTRUCTION PERMITS

A.    Permit Issuance. The CITY shall issue building permits to the OWNER to construct dwelling units and other structures and improvements within fourteen (14) days of receipt of application therefore or within fourteen (14) days of the City's receipt of the last of the documents required to support such application. If the application is denied, the City shall provide the Owner within the above time period with a written statement specifying the reasons for denial of the application including specifications of the requirements of law which the application or supporting documents fail to meet. The City shall issue such building permits upon the Owner's compliance with those requirements, provided a final plat has been recorded.

B.    Architectural Controls. Building permits for construction of dwelling units shall be subject to the CITY's Appearance Code (Title 8, Chapter 15 of the City Code) in the form as adopted by Ordinance No. 2005-51, a copy of which is attached hereto as **Exhibit "J"**.

C.    Completion of Improvements Prior to Occupancy. The CITY agrees to issue certificates of occupancy within seven (7) working days of a request for final inspection and submittal of all required documents or issue a letter of denial within said period of time informing the permit applicant specifically as to what corrections are necessary as a condition to the issuance of a certificate of occupancy and quoting the specific section(s) of the Code and/or this Agreement relied on by the CITY. Street trees, parkway seeding, driveways, and final surface course of streets or other similar items which cannot be installed or completed because seasonal weather does not permit same need not be completed prior to issuance of an occupancy permit for any such dwelling unit. The OWNER shall comply with the CITY's site inspection policy for certificates of occupancy. At all times during construction the OWNER shall be responsible for removal of construction debris and waste related to the PROPERTY.

## 16.    MODEL HOMES, PRODUCTION UNITS, SALES TRAILERS, CONTRACTOR TRAILERS.

A.    During the development and build out period of the PROPERTY (subsequent to final plat approval), the OWNER, and such other persons or entities as the OWNER may authorize, may construct, operate and maintain model homes and sales trailers within the PROPERTY staffed with the OWNER'S, or such other person's or entity's, sales and construction staff, and may be utilized for sales and construction offices for the PROPERTY. The number of such model homes and sales trailers and the locations thereof shall be as from time to time determined or authorized by the OWNER.

B.    Off-street parking shall be required for model homes when more than five (5) model homes are constructed on consecutive lots in a model home row. Three (3) off-street spaces will be required for each model home in a model home row, with combined required parking not to exceed thirty (30) off-street spaces. A site plan showing the location of the parking areas and walks will be submitted for review and approval by the CITY.

C.     No off-street parking shall be required for individual model homes or sales trailers that are not part of a model home row other than the driveway for such model home/sales trailer capable of parking three (3) cars outside of the adjacent road right-of-way.  Building permits for model homes, sales trailers and for up to fifteen (15) production dwelling units shall be issued by the CITY upon proper application thereof prior to the installation of Land Improvements (provided a gravel access road is provided for emergency vehicles and upon proof to the CITY the OWNER has demonstrated to the Bristol-Kendall Fire Protection District fire hydrants within 300 feet of the dwelling units are operational).  A final inspection shall be conducted prior to the use of a model home and water shall be made available within 300' of the model home.  There shall be no occupation or use of any model homes or production dwelling units until the binder course of asphalt is on the street, and no occupation or use of any production dwelling units until the water system and sanitary sewer system needed to service such dwelling unit are installed and operational.

D.     The OWNER may locate temporary sales and construction trailers upon the PROPERTY during the development and build out of the PROPERTY prior to final plat approval, provided any such temporary trailers shall be removed within one (1) week following issuance of the last occupancy permit for the PROPERTY.  A building permit will be required by the CITY for any temporary trailer that will be utilized as office space.  Prior to construction of the temporary sales trailers the OWNER shall submit an exhibit of the sales trailer sites with landscaping and elevations for the CITY'S approval.  All contractor's trailers and supply trailers shall be kept in good working order and the area will be kept clean and free of debris.  No contractor's trailers or supply trailers shall be located in the public right-of-way.

E.     The OWNER hereby agrees to indemnify, defend and hold harmless the CITY and the Corporate Authorities (collectively "**Indemnities**") from all claims, liabilities, costs and expenses incurred by or brought against all or any of the Indemnities as a direct and proximate result of the construction of any model homes or production dwelling units prior to the installation of the public street and water improvements required to service such dwelling unit.

17.     **ONSITE EASEMENTS AND IMPROVEMENTS.**

In the event that during the development of the PROPERTY, the OWNER determines that any existing utility easements and/or underground lines require relocation to facilitate the completion of the OWNER's obligation for the PROPERTY in accordance with this Agreement and the Preliminary Plans, and subsequently approved final engineering plans and specifications, the CITY shall fully cooperate with the OWNER in causing the vacation and relocation of such existing easements and/or utilities, however, all costs incurred in furtherance thereof shall be borne by the OWNER.  If any easement granted to the CITY as a part of the development of the PROPERTY is subsequently determined to be in error or located in a manner inconsistent with the intended development of the PROPERTY as reflected on the Preliminary Plans and in this Agreement, the CITY shall fully cooperate with the OWNER in vacating and relocating such easement and utility facilities located therein, which costs shall be borne by the OWNER. Notwithstanding the foregoing, and as a condition precedent to any vacation of easement, the OWNER shall pay for the cost of design and relocation of any such easement and the public utilities located therein unless the relocation involves overhead utilities. If any existing overhead utilities are required to be relocated or buried on perimeter roads that are the responsibility of the

OWNER, the CITY agrees to be the lead agency in the relocation of those utilities. Upon the OWNER'S request, the CITY will make the request to have overhead utilities relocated and will make the relocation of such utilities a CITY project to be funded by the OWNER. The CITY shall receive no compensation for the services it agrees to provide in this Section.

18.   **FEES, CHARGES AND CONTRIBUTIONS.**

During the first five (5) years following the date of this Agreement, the CITY shall impose upon and collect from the OWNERS and/or DEVELOPER, and their respective contractors and suppliers, only those permit, license, tap on and connection fees and charges, and in such amount or at such rate, as are in effect on the date of this Agreement and as is generally applied throughout the CITY, except as otherwise expressly provided for in this agreement on the Fee Schedule attached hereto and made a part hereof as **Exhibit "F"**. At the expiration of this five (5) year term, the CITY shall give the OWNERS and DEVELOPER a six (6) month grace period from the date they are notified of any changes to the permit, license, tap on and connection fees and charges in order to comply with the new regulations.

19.   **SCHOOL AND PARK LAND / CASH CONTRIBUTIONS.**

A.   School Land / Cash Contributions. The amount of $4,781.00 per dwelling unit shall be paid at the time of building permit application in satisfaction of the requirements for school cash contributions under the School Land / Cash Ordinance in effect as of the Effective Date.

B.   Park Land / Cash Contributions. The final plat of subdivision shall dedicate to the CITY a 20-foot wide area for a recreational path ("Path") and an approximately 1.88 acre community park ("Park") in the areas noted and indicated on the Preliminary Plans. The OWNER shall construct the Path in accordance with approved final engineering plans and specifications within two (2) years of the pre-construction conference for the first phase of development required by the Yorkville City Code. As a condition of recording the final plat, the OWNER shall pay to the CITY cash as required by and in accordance with the Park Land/Cash Ordinance in effect as of the Effective Date. In calculating the amount due thereunder the CITY agrees that OWNER shall be entitled to full credit for 100% of the total acreage of the dedicated Park and improved Path and shall pay the City $392,800.00 for the balance of OWNER'S contribution requirements under said Ordinance. The CITY shall commence park improvements within one (1) year of appropriate access (curb and gravel) being available to the dedicated park site for construction. CITY shall be responsible for all improvements to the park property (Lot 224 of the Preliminary Plat of Subdivision) upon dedication of the PROPERTY to CITY, excluding OWNER'S grading obligation.

20.   **AMENDMENTS TO ORDINANCES.** The specific modifications and deviations from the CITY's ordinances, rules, and codes contained herein have been requested, approved and are permitted with respect to the development, construction, and use of the PROPERTY ("Permitted Modifications").

OWNERS and DEVELOPER shall be granted approval by the CITY to utilize a four to one (4/1) side slope ratio with a five foot (5') buffer requirement in the retention areas and to

have retention ponds with an area of less than two (2) acres as depicted in **Exhibit "K"**. The CITY further approves all other variances, exceptions, deviations or departures necessary for the Approved Plans to conform with all CITY ordinances governing the subject development.

All ordinances, regulations, and codes of the CITY, including, without limitation those pertaining to subdivision controls, zoning, storm water management and drainage, comprehensive land use plan, and related restrictions, as they presently exist, except as amended varied, or modified by the terms of this Agreement, shall apply to the PROPERTY and its development for a period of five (5) years from the date of this Agreement. Any amendments, repeal, or additional regulations, which are subsequently enacted by the CITY, shall not be applied to the development of the PROPERTY except upon the written consent of OWNERS during said five (5) year period. The CITY shall give the OWNERS a six (6) month grace period from the date they are notified of any changes to the ordinances, regulations, and codes of the CITY in order to comply with the new regulations. After said five (5) year period, the PROPERTY and its development will be subject to all ordinances, regulations, and codes of the CITY in existence on or adopted after the date of this Agreement, provided, however, that the application of any such ordinance, regulation or code shall not result in a reduction in the number of residential building lots herein approved for the PROPERTY, alter or eliminate any of the ordinance modifications and/or variations provided for herein, nor result in any subdivided lot or structure constructed within the PROPERTY being classified as non-conforming under any ordinance of the CITY. The foregoing to the contrary notwithstanding, in the event the CITY is required to modify, amend or enact any ordinance or regulation and to apply the same to the PROPERTY pursuant to the express and specific mandate of any State of Illinois or federal governmental authority, such ordinance or regulation shall apply to the PROPERTY and be complied with by OWNER, provided, however, that any so called "grandfather" provision contained in such governmental mandate which would serve to exempt or delay implementation against the PROPERTY shall be given full force and effect.

If, during the term of this Agreement, any existing, amended, modified or new ordinances, codes or regulations affecting the zoning, subdivision, development, construction of any improvements, buildings, appurtenances, or any other development of any kind or character upon the PROPERTY, other than those upon which site plan approval may be based, are amended or modified to impose less restrictive requirements on development or construction upon properties situated within the CITY'S boundaries, then the benefit of such less restrictive requirements shall inure to the benefit of the OWNERS, and anything to the contrary contained herein notwithstanding, the OWNERS may proceed with development or construction upon the PROPERTY pursuant to the less restrictive amendment or modification applicable generally to all properties within the CITY.

21.    **BUILDING CODE.** The CITY has adopted the International Building Code, which is updated approximately every three years. The building codes for the CITY in effect as of the date of building permit application will govern any and all construction activity within the PROPERTY.

22.    REMEDIES.

Without limiting any of the remedies otherwise available at law or in equity to OWNER or CITY as a result of the breach of this Agreement, the Parties agree as follows:

A.    This Agreement shall be enforceable in any court of competent jurisdiction in the State of Illinois by the Parties and their successors and assigns. Enforcement may be sought by an appropriate action at law or in equity to secure performance of the covenants, agreements, conditions and obligations contained herein, including specific performance of this Agreement. This Agreement shall be governed by the laws of the State of Illinois.

B.    No action taken by any Party pursuant to the provisions of this or any other section of this Agreement shall constitute an election of remedies, and all remedies set forth in this Agreement, as well as any remedies at law or in equity, shall be cumulative and shall not exclude any other remedy.

C.    Unless otherwise expressly provided herein, in the event of a material breach of this Agreement, the Parties agree that the defaulting Party shall have thirty (30) days after written notice of said breach to correct the same prior to the non-breaching Party's seeking of any remedy provided for herein. If such breach cannot be corrected within thirty (30) days, the non-breaching Party shall not seek to exercise any remedy provided for herein as long as the defaulting Party has initiated the cure of said breach and is diligently prosecuting the cure of said breach.

D.    In the event the performance of any covenant to be performed hereunder by any Party is delayed for causes which are beyond the reasonable control of the Party responsible for such performance (which causes shall include, but not be limited to, acts of God; inclement weather conditions; strikes; material shortages; lockouts; the revocation, suspension, or inability to secure any necessary governmental permit, license, or and any similar cause), the time for such performance shall be extended by the amount of time of such delay.

E.    The failure of the Parties to insist upon the strict and prompt performance of the terms, covenants, agreements, and conditions herein contained, or any of them, upon any other Party imposed, shall not constitute or be construed as a waiver or relinquishment of any Party's right thereafter to enforce any such term, covenant, agreement, or condition, but the same shall continue in full force and effect.

23.    PARTIAL INVALIDITY OF AGREEMENT.

A.    This Agreement is entered into pursuant to the provisions of Chapter 65, Sec. 5/11-15.1-1, et seq., Illinois Compiled Statutes. If any provision of this Agreement (except those provisions relating to the requested annexation and rezoning of the PROPERTY and approval of Preliminary Plans identified herein and the ordinances adopted in connection herewith), or its application to any person, entity, or property is held invalid, such provision shall be deemed to be excised herefrom and the invalidity thereof shall not affect the application or validity of any other terms, conditions and provisions of this Agreement and, to that end, any terms, conditions and provisions of this Agreement are declared to be severable. In addition, the CITY and

OWNER shall take all action necessary or required to fulfill the intent of this Agreement as to the use and development of the PROPERTY.

B.    If, for any reason during the term of this Agreement, any approval or permission granted hereunder regarding annexation, plans or plats of subdivision or zoning is declared invalid, the CITY agrees to take whatever action is necessary to reconfirm such annexation, plans and zoning ordinances effectuating the annexation, zoning, variations and plat approvals proposed herein.

## 24.    NOTICES

All notices shall be in writing and shall be delivered personally or by a nationally recognized overnight courier, prepaid, or shall be sent by registered or certified mail, return receipt requested, postage prepaid, at the following addresses:

CITY:              UNITED CITY OF YORKVILLE
                   800 Game Farm Road
                   Yorkville, IL 60560
                   Attn:  Mayor
                   Attn:  City Administrator

copy to:           City Attorney:
                   John J. Wyeth, Esq.
                   800 Game Farm Road
                   Yorkville, IL 60560

OWNER:             Aspen Ridge Estates LLC
                   19250 Everett Lane
                   Suite 101
                   Mokena, Illinois 60448
                   Attn:  Paul Dresden

copy to:           Robert Gamrath, Esq.
                   Quarles & Brady LLP
                   500 West Madison Street
                   Suite 3700
                   Chicago, Illinois 60661

Service shall be deemed to be upon delivery unless delivery is rejected and then service shall be deemed to have occurred upon such rejection.

## 25.    GENERAL PROVISIONS.

A.    Entire Agreement. This Agreement contains all the terms and conditions agreed upon by the parties hereto and no other prior agreement regarding the subject matter hereof shall be deemed to exist to bind the parties. The parties acknowledge and agree that the terms and conditions of this Agreement, including the payment of any fees, have been reached through a process of good faith negotiation, both by principals and through counsel, and represent terms

and conditions that are deemed by the parties to be fair, reasonable, acceptable and contractually binding upon each of them.

B.    Amendment.  This Agreement, and any Exhibits or attachments hereto, may be amended from time to time in writing with the consent of the parties, pursuant to applicable provisions of the City Code and Illinois Compiled Statutes in force from time to time.  The CITY and the then owner of record of any portion of the PROPERTY, even if not the OWNER named herein, may agree (only in writing) to amend or modify this Agreement as to such portion(s) of the PROPERTY without the consent of the owner(s) of other portion(s) of the PROPERTY, so long as such amendment or modification does not alter the rights, obligations or remedies provided in this Agreement for any owner or any other portion of the PROPERTY which is owned by such owner of record.

C.    No Third Party Beneficiaries.  No provision of this Agreement is intended to benefit, nor shall any provision of this Agreement benefit, any party, individual or entity other than a party to this Agreement or its respective successor or assign.

D.    Effective Date.  The date on which this Agreement becomes effective (the "**Effective Date**") shall be the date on which it has been approved and executed by all parties hereto.

E.    Term of Agreement.  This Agreement shall be effective from its Effective Date for twenty (20) years (the "**Term**"); provided, however, that if any action is filed or any claim is made challenging the legality, validity or enforceability of this Agreement, the period during which such action or claim is pending or unresolved shall not be included as part of the Term of this Agreement.  In the event construction is commenced with respect to said construction until it is complete within said twenty-year period, all of the terms of this Agreement shall remain enforceable despite said time limitation, unless modified by written agreement of the CITY and the OWNER.

F.    Representations as to Further Action.  The CITY and the OWNER hereby agree to take all reasonably necessary actions as may be required to carry out the terms of this Agreement and to do so in a timely fashion.  The OWNER shall operate as required to effectuate these actions, and the CITY shall use its best efforts to take such actions in a timely manner.  Failure of either party to take such actions shall be considered an event of default under this Agreement.  The CITY agrees to authorize the Mayor and City Clerk to execute this Agreement or to correct any technical defects which may arise after the execution of this Agreement.

G.    Captions and Paragraph Headings.  The captions and paragraph headings used herein are for convenience only and shall not be used in construing any term or provision of this Agreement.

H.    Recording.  This Agreement shall be recorded in the Office of the Recorder of Deeds, Kendall County, Illinois, at OWNER'S expense.

I.    Recitals and Exhibits.  The recitals set forth at the beginning of this Agreement, and the exhibits attached hereto, are incorporated herein by this reference and shall constitute substantive provisions of this Agreement.

J.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

K.      Time is of the Essence.  Time is of the essence of this Agreement and all documents, agreements, and contracts pursuant hereto as well as all covenants contained in this Agreement shall be performed in a timely manner by all parties hereto.

L.      Exculpation.  It is agreed that the CITY is not liable or responsible for any restrictions on the CITY'S obligations under this Agreement that may be required or imposed by any other governmental bodies or agencies having jurisdiction over the PROPERTY, the CITY, or the OWNER, including, but not limited to, county, state or federal regulatory bodies.

## 26.   SUCCESSORS AND ASSIGNS.

A.      This Agreement shall inure to the benefit of and be binding upon the OWNER and its successor(s) in title and interest, and upon the CITY, and any successor municipalities of the CITY.  It is specifically agreed that the OWNER shall have the right to sell, transfer, lease, and assign all or any part of the PROPERTY to other persons, firms, partnerships, corporations, or other entities for building or development purposes (as well as for occupancy) and that such persons, firms, partnerships, corporations, or other entities shall be entitled to the same rights and have the same obligations as the OWNER has under this Agreement.

B.      It is understood and agreed that this Agreement constitutes a covenant running with the land and as such, shall be assignable to and binding upon each and every subsequent grantee and successor in interest of the OWNER and the CITY.

C.      Nothing contained in this Agreement shall be construed to restrict or limit the right of the OWNER to sell or convey all or any portion of the PROPERTY, whether improved or unimproved.

D.      The foregoing to the contrary notwithstanding, the obligations and duties of the OWNER hereunder shall not be deemed transferred to or assumed by, any purchaser of a empty lot or a lot improved with a dwelling unit who acquires the same for purchaser's residential occupation, unless otherwise expressly agreed in writing by such purchaser.

E.      E.      Upon any sale, transfer or assignment of the PROPERTY, the OWNER shall no longer have any rights or obligations hereunder other than those rights that vested prior to such sale, transfer or obligation.

F.      In the event of a sale, transfer or assignment, the CITY shall have no duty to return any portion of any security posted in connection with the portion of the PROPERTY so transferred until substitute security acceptable to CITY is received.

27.    USE OF PROPERTY FOR FARMING/ZONING.

Any portion of the PROPERTY, which is not conveyed or under development as provided herein, may be used for farming purposes, regardless of the underlying residential zoning district classification.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[EXECUTED ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

CITY:                                    OWNER:

THE UNITED CITY OF YORKVILLE             ASPEN RIDGE ESTATES LLC

By: _____           By: _____
     Mayor                                   Its: _____

Attest: _____
         City Clerk

Date of Execution: AUGUST 8 , 2006      Date of Execution: AUGUST 8 , 2006

STATE OF ILLINOIS     )
                      )
COUNTY OF KENDALL)

On this _8th_ day of _AuGust_  2006, before me, the undersigned Notary Public, personally appeared _Arthur F. Prochaska, Jr._ and _Jacquelyn Milschewski_ respectively known to me to be the Mayor and Clerk of the **City of Yorkville**, an Illinois municipal corporation, and executed and acknowledged the Agreement to be the free and voluntary act of the City of Yorkville, for the uses and purposes therein mentioned, and on oath stated that they are authorized to respectively execute and witness this Agreement and in fact executed and witnessed this Agreement on behalf of the City of Yorkville.

_Lisa Pickering_
NOTARY PUBLIC

My Commission Expires: _12/13/08_

OFFICIAL SEAL
LISA PICKERING
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/13/08

STATE OF ILLINOIS     )
                      )
COUNTY OF _Kendall_ )

On this _8th_ day of _AuGust_  2006, before me, the undersigned Notary Public, personally appeared Paul Dresden known to me to be a Member of **Aspen Ridge Estates LLC**, an Illinois limited liability company, and executed and acknowledged the Agreement to be the free and voluntary act of the company, for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute this Agreement and in fact executed and witnessed this Agreement on behalf of the company.

_Lisa Pickering_
NOTARY PUBLIC

My Commission Expires: _12/13/08_

OFFICIAL SEAL
LISA PICKERING
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/13/08

<u>EXHIBITS</u>

FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB

A.   Legal Description

B.   Preliminary Plat of Subdivision

C.   Preliminary Engineering Plans

D.   Landscape Plans

E.   Phasing Plan

F.   Fee Schedule

G.   Individual Development Off-Site Improvements

H.   Pavilion Road Improvements

I.   On Site Sanitary Sewer Benefited Properties

J.   Appearance Code

K.   Detention Pond Modifications

AAA. Overall Infrastructure Funding Summary and Funding Distribution
      (AAA-1 - AAA-5)

BBB. Front Funding Distribution Summary

CCC. Schedule for Completion of the Southwest Infrastructure

DDD. Benefited Properties

EEE. Rebate Agreement

FFF. Draft Special Tax Bond Term Sheet

*LEGAL DESCRIPTION*

THAT PART OF SECTION 5 AND THAT PART OF THE EAST HALF OF SECTION 6, AND THAT PART OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF UNIT FIVE, FOXLAWN; THENCE NORTH 67 DEGREES 26 MINUTES 00 SECONDS EAST ALONG THE SOUTHERLY LINE OF UNIT FIVE, FOXLAWN 816.1 FEET TO THE SOUTHEASTERLY CORNER THEREOF; THENCE NORTH 67 DEGREES 20 MINUTES 16 SECONDS EAST ALONG A FENCE LINE 1473.92 FEET; THENCE SOUTH 16 DEGREES 21 MINUTES 28 SECONDS EAST ALONG A FENCE LINE 1537.61 FEET; THENCE SOUTH 16 DEGREES 28 MINUTES 31 SECONDS EAST ALONG A FENCE LINE 2,228.02 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF ILLINOIS STATE ROUTE NUMBER 71, THIS COURSE HEREINAFTER REFERRED TO AS LINE 'A'; THENCE WESTERLY ALONG SAID NORTHERLY RIGHT OF WAY LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5105.59 FEET, A DISTANCE OF 90.13 FEET TO A LINE DRAWN PARALLEL WITH AND 90 FEET WESTERLY OF, AS MEASURED AT RIGHT ANGLES TO, LINE 'A' AFORESAID; THENCE NORTH 16 DEGREES 28 MINUTES 31 SECONDS WEST ALONG SAID LINE DRAWN PARALLEL WITH LINE 'A' 484.93 FEET; THENCE SOUTH 72 DEGREES 05 MINUTES 18 SECONDS WEST 473.01 FEET; THENCE SOUTH 16 DEGREES 28 MINUTES 31 SECONDS EAST 272.84 FEET; THENCE SOUTH 32 DEGREES 41 MINUTES 01 SECONDS EAST 188.57 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF SAID ROUTE NUMBER 71; THENCE SOUTH 74 DEGREES 35 MINUTES 16 SECONDS WEST ALONG SAID NORTHERLY RIGHT OF WAY LINE 440.05 FEET TO THE SOUTHEASTERLY CORNER OF A TRACT OF LAND CONVEYED TO GEORGE C. BELL AND WIFE BY WARRANTY DEED RECORDED JANUARY 13, 1971 AS DOCUMENT 71-93; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG AN EASTERLY LINE OF SAID BELL TRACT 240 FEET TO AN ANGLE IN SAID EASTERLY LINE; THENCE NORTH 74 DEGREES 42 MINUTES 30 SECONDS EAST 100 FEET; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST 360 FEET; THENCE SOUTH 74 DEGREES 42 MINUTES 30 SECONDS WEST 371 FEET; THENCE SOUTH 18 DEGREES 07 MINUTES 30 SECONDS EAST 182 FEET; THENCE SOUTH 74 DEGREES 47 MINUTES 30 SECONDS WEST 418 FEET TO THE EASTERLY LINE OF A TRACT OF LAND CONVEYED TO MERVIN J. WISSMILLER AND WIFE BY WARRANTY DEED RECORDED APRIL 30, 1974 AS DOCUMENT 74-1947; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG SAID EASTERLY LINE 576.02 FEET TO THE NORTHEAST CORNER OF SAID WISSMILLER TRACT; THENCE SOUTH 72 DEGREES 23 MINUTES 49 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID TRACT 720.25 FEET; THENCE NORTH 13 DEGREES 56 MINUTES 14 SECONDS WEST 2495.06 FEET TO THE POINT OF BEGINNING, (EXCEPT THAT PART OF THE SOUTHWEST QUARTER OF SECTION 5, AND THAT PART OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 5; THENCE EASTERLY ALONG THE SOUTH LINE OF SAID SECTION 5, 362.34 FEET; THENCE NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST 189.5 FEET TO THE NORTH LINE OF ILLINOIS STATE ROUTE NUMBER 71; THENCE WESTERLY ALONG SAID NORTH LINE TO A POINT WHICH IS 90.0 FEET NORMALLY DISTANT WESTERLY OF THE LAST DESCRIBED COURSE; THENCE WESTERLY ALONG SAID NORTH LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5,105.59 FEET, 191.17 FEET; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 117.50 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 112.0 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 36.76 FEET TO AN ANGLE POINT IN SAD NORTH LINE; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 278.0 FEET FOR THE POINT OF BEGINNING; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE, 125.59 FEET TO THE SOUTHEASTERLY CORNER OF A TRACT OF LAND CONVEYED TO GEORGE C. BELL, AND HIS WIFE BY WARRANTY DEED RECORDED JANUARY 13, 1971 AS DOCUMENT 71-93; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG AN EASTERLY LINE OF SAID BELL TRACT, 240 FEET TO AN ANGLE IN SAID EASTERLY LINE; THENCE NORTH 74 DEGREES 42 MINUTES 30 SECONDS EAST TO A LINE DRAWN NORTHWESTERLY FROM, AS MEASURED AT RIGHT ANGLES TO THE NORTHERLY LINE OF SAID ROUTE 71, FROM THE POINT OF BEGINNING; THENCE SOUTHEASTERLY ALONG SAID LINE TO THE POINT OF BEGINNING; AND ALSO EXCEPT THAT PART OF THE SOUTH HALF OF SECTION 5, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 5; THENCE EASTERLY ALONG THE SOUTH LINE OF SAID SECTION 5, 362.34 FEET; THENCE NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST 189.5 FEET TO THE NORTH LINE OF ILLINOIS STATE ROUTE NUMBER 71; THENCE WESTERLY ALONG SAID NORTH LINE TO A POINT WHICH IS 90.0 FEET NORMALLY DISTANT WESTERLY OF THE LAST DESCRIBED COURSE; THENCE WESTERLY ALONG SAID NORTH LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5,105.59 FEET, 191.17 FEET; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 117.50 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 112.0 FEET; THENCE NORTH 30 DEGREES 36 MINUTES 39 SECONDS WEST 188.57 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 30 DEGREES 36 MINUTES 39 SECONDS EAST 188.57 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 36.76 FEET TO AN ANGLE POINT IN SAID NORTH LINE; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 278.0 FEET; THENCE NORTHWESTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE 300.0 FEET; THENCE NORTHEASTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE 259.40 FEET TO A LINE DRAWN NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST FROM THE POINT OF BEGINNING; THENCE SOUTH 14 DEGREES 17 MINUTES 11 SECONDS EAST 123.25 FEET TO THE POINT OF BEGINNING) IN THE TOWNSHIP OF KENDALL, KENDALL COUNTY, ILLINOIS.

# ASPEN RIDGE ESTATES
## PRELIMINARY PLAT
## OF SUBDIVISION
### Yorkville, Illinois
### Fox and Kendall Townships, Kendall County
### Section 1, Township 36 North, Range 6 East
### and Section 6, Township 36 North, Range 7 East
### Existing Zoning - (Kendall County, A-1)
### Proposed Zoning - (City of Yorkville, R-2)

**EXHIBIT B**

### Plans Prepared For:
Aspen Ridge Estates, L.L.C.
19250 Everett Lane, Suite 101
Mokena, IL 60448

**Project Contact:**
Mr. Marvin DeLahr
Phone: (708) 479-1306
Fax: (708) 479-6537

SMITH ENGINEERING CONSULTANTS, INC.



SITE LOCATION MAP

PROJECT AREA

SITE BENCH-MARKS:

SMITH ENGINEERING CONTACT:
PHILIP J. HUINKER P.E., GENERAL MANAGER OF LAND DEVELOPMENT
(630) 553-7560
DAVID W. SCHULTZ P.E., PROJECT MANAGER
(630) 553-7560
JOSH D. GARRETT E.I., PROJECT ENGINEER
(630) 553-7560

CALL J.U.L.I.E. 1-800-892-0123



LAND USE SUMMARY

LEGAL DESCRIPTION

DENSITY CHART EXPLANATION

NOTES:

LEGEND

STANDARD ABBREVIATIONS

PRELIMINARY PLAT
OF SUBDIVISION
ASPEN RIDGE ESTATES
YORKVILLE, ILLINOIS



# ASPEN RIDGE
## PRELIMINARY PLAT OF SUBDIVISION
### Yorkville, Illinois
Fox and Kendall Townships, Kendall County
Section 1, Township 36 North, Range 6 East
and Section 6, Township 36 North, Range 7 East
Existing Zoning - (Kendall County, A-1)
Proposed Zoning - (City of Yorkville, R-2)

# EXHIBIT B



EXHIBIT B

EXHIBIT C



PRELIMINARY ENGINEERING PLANS
PREPARED FOR:

# ASPEN RIDGE ESTATES

Yorkville, Illinois
Fox and Kendall Townships, Kendall County
Section 1, Township 36 North, Range 6 East
and Section 6, Township 36 North, Range 7 East
Existing Zoning - (Kendall County, A-1)
Proposed Zoning - (City of Yorkville, R-2)

Plans Prepared For:
Aspen Ridge Estates, L.L.C.
19250 Everett Lane, Suite 101
Mokena, IL 60448

Project Contact:
Mr. Marvin DeLahr
Phone: (708) 479-1306
Fax: (708) 479-6537

# EXHIBIT C



EXHIBIT C





EXHIBIT D



EXHIBIT D

ASPEN RIDGE
ESTATES
NORVILLE, ILLINOIS

ASPEN RIDGE
ESTATES,
L.L.C.
P.O. BOX 1356
FRANKFORT, ILLINOIS
60423

Ives/Ryan
Group, Inc.

FOX RD. ENTRY &
FOX RD. BUFFER
LANDSCAPE PLAN

SHEET
L-2

PAVILLION ROAD

PAVILLION RD. ENTRY LANDSCAPE PLAN

FOX ROAD

FOX RD. BUFFER LANDSCAPE PLAN

FOX ROAD

FOX RD. ENTRY FEATURE LANDSCAPE PLAN

NORTH



EXHIBIT D



EXHIBIT E

## EXHIBIT F

| | Name of Fee | Amount | Time of Payment |
|---|---|---|---|
| 1 | School District Transition Fee | $3,000 per unit | Paid to School District Office prior to application for building permit |
| 2 | Yorkville Bristol Sanitary District Connection Fee | $1,400 per unit | At time of building permit, paid at City Hall with separate check made out to YBSD |
| 3 | Yorkville Bristol Sanitary District Annexation Fee | $3,523 per acre | Paid for entire development, at time of annexation to sanitary district |
| 4 | Yorkville Bristol Sanitary District Infrastructure Fee | $3,523 per acre | PAID BY SPECIAL TAX PROCEEDS |
| 5 | Building Permit Fee | $650 + $0.20 per square foot | Building Permit |
| 6 | Water Connection Fee | $3,700 per unit | PAID BY SPECIAL TAX PROCEEDS |
| 7 | Water Meter Cost (not applicable to fee lock) | $390 per unit | Building Permit |
| 8 | City Sewer Connection Fee | $2,000 per unit | PAID BY SPECIAL TAX PROCEEDS |
| 9 | Water and Sewer Inspection Fee | $25 per unit | Building Permit |
| 10 | Public Walks and Driveway Inspection Fee | $35 per unit | Building Permit |
| 11a | Public Works (Development Impact Fee) | $700 per unit | Building Permit |
| 11b | Police (Development Impact Fee) | $300 per unit | Building Permit |
| 11c | Municipal Building (Development Impact Fee) | see "time of payment" | Municipal Building Fee is set up as $5,509 per unit if paid at time of permit, or $3,288 per unit if paid in a lump sum for all residential units at the time of final plat approval or within 90 days of when all City infrastructure is available to the development, whichever is later. |
| 11d | Library (Development Impact Fee) | $500 per unit | Building Permit |
| 11e | Parks and Rec (Development Impact Fee) | $50 per unit | Building Permit |
| 11f | Engineering (Development Impact Fee) | $100 per unit | Building Permit |
| 11g | Bristol Kendall Fire District (Development Impact Fee) | $1,000 per unit | Building Permit |
| 12 | Parks Land Cash Fee | Calculated by ordinance, $80,000 per acre | Building Permit or Final Plat, depending on annexation/development agreement and land/cash donations negotiated |
| 13 | School Land Cash Fee | Calculated by ordinance, $80,000 per acre | Building Permit or Final Plat, depending on annexation/development agreement and land/cash donations negotiated |
| 14 | Road Contribution Fund | $541 per unit | $1,459 (per unit) PAID BY SPECIAL TAX PROCEEDS |
| 15 | County Road Fee | $875 per unit, escalating each calendar year at a rate determined by ordinance | $674 (per unit) PAID BY SPECIAL TAX PROCEEDS |
| 16 | Weather Warning Siren | $75 per acre | Final Plat |
| 17 | Administration Review Fee | actual cost | Upon receipt of invoices |
| 18 | Engineering Review Fee | actual cost | Upon receipt of invoices |





EXHIBIT H



# EXHIBIT I



# EXHIBIT J

Exhibit "A"
Title 8, Building Regulations
New Chapter 15

## APPEARANCE CODE

**I.    OBJECTIVES**

1.    The fostering of:

   a.    Sound and harmonious design of new buildings and sites.

   b.    Greater interest in the development and redevelopment of business and industrial areas with an emphasis on appearance as it relates to each specific project, its surroundings and the community, by giving encouragement, guidance and direction.

   c.    Better maintenance of properties through encouragement of preservation, upkeep, protection and care.

   d.    Greater public interest and enthusiasm in overall community beauty, appearance, cleanliness and order.

2.    Establish standards for new construction and development with respect to, but not limited to, buildings, streetscapes and landscapes.

3.    Encourage creative non-monotonous community designs utilizing design professionals.

**II.    APPLICABILITY**

1.    The provisions of this code shall apply to:

   a.    building permits for new construction applied for after the execution of the Ordinance, and/or

   b.    building permits for additions to existing commercial or industrial buildings where the permit is applied for after the execution of the ordinance and where the cumulative addition(s) are equal to 10% of the floor area or 200 sq. ft., whichever is more and/or

   c.    The standards in this code shall be pro-rated when being applied to additions to all principal buildings or major re-construction (i.e., 25% of the façade is removed and/or different type of façade material is used and/or if the size of windows/doors are being modified by more than 25%) done to non-residential or attached single family or multi-family buildings

1

# EXHIBIT J

### APPEARANCE CODE

d.  Additions and/or major façade work shall be assessed on a cumulative basis (i.e., if a 10 percent modification is conducted at one time and later another 10 percent modification is made, the cumulative impact is 20% and therefore, a 20% compliance ratio is expected.)

2.  The provisions of this code shall not apply to:

   a.  This code shall not apply to industrial accessory structures. However, all accessory structures should compliment the main structure.

   b.  This code shall not apply to those buildings where siding is being replaced with similar siding materials.

   c.  Provisions of this Code shall not apply to any PUDs already approved prior to the adoption of this Code unless so stipulated in the PUD

3.  The provisions of this code shall be deferred until May 1, 2009, for lots located within the Fox Industrial Park.

## III. PROCEDURES

1.  The City Building Official, or his/her designee, shall review the plan and/or drawing of the exterior design of every building and site to be constructed in the City for compliance with this code, prior to the issuance of a building permit. Building permits shall only be issued upon authorization of the City Building Official.

2.  Any appeals to this Code or the City Building Official's determination of compliance with this code, shall be made in writing and submitted to the City Building Official. The City Building Official shall direct such requests to the Façade Committee, who shall make a recommendation to the City Council. The City Council's decision shall be final.

3.  The Façade Committee shall consider the following points prior to providing the City Council with a written recommendation:

   a.  Will the objectives outlines in Section I be met if the requested deviations are granted?

   b.  Is there a particular physical condition of the specific property and/or building(s) involved that would create a particular hardship to the owner, as distinguished from a mere inconvenience, if the strict letter of these regulations were carried out?

   c.  Will granting the requested deviation from these regulations be detrimental to the public welfare or injurious to other property or improvements in the neighborhood in which the property is located?

2

EXHIBIT J

APPEARANCE CODE

    d.    Will granting the requested deviation impair an adequate supply of light and air to buildings on the subject property or to the adjacent property?

    e.    Will granting the requested deviation increase the danger to the public safety, or substantially diminish or impair property values within the neighborhood?

## IV.  DEFINITIONS

1.    Across the Street:  A lot with a side yard property line, when projected across the street, intersects the front property line of the subject lot.

3.    Adjacent To:  defined as lots sharing a side yard property line.

4.    Contiguous lot:  Shares a common property line extended across the street with such lot.

5.    Front Facade:  the net surface area, excluding windows, doors and garages, that faces a street and includes a main entry to the building..

6.    Major Architectural Features:  Covered porches, Boxed-out Bays/Projections; Decorative Dormers, Juliet Balconies, Metal Roofs.  [10% credit for each]

6.    Masonry Products:  brick, stone, split face brick or architectural blocks.

7.    Premium Siding Material:  Masonry Products cultured stone, natural wood siding and synthetic stucco

## V.  CRITERIA FOR APPEARANCE

1.    **General**

    Creativity and ingenuity in applying the standards and guidelines listed in this Code are encouraged.  Likewise, ingenuity and creativity, while considering deviations to the standards and guidelines of this Code, are encouraged.

2.    Landscape and Site Treatment

    a.    The provisions of the City of Yorkville's Landscape Ordinance shall apply.

    b.    Exterior lighting, when used, shall enhance the building design and the adjoining landscape.  Lighting standards and fixtures shall be of a design and size compatible with the building and adjacent areas.  Lighting shall be restrained in design and excessive brightness and brilliant colors avoided.

3

# EXHIBIT J

## APPEARANCE CODE

Maximum illumination at the property line shall not exceed 0.1 footcandles and no glare shall spill onto adjacent properties or right-of-ways.

   c.   The provisions of the Ordinance in regards to bulk regulations, standards and off-street parking; relating to trees and shrubs; all other Ordinances, or portions of Ordinances, which directly affect appearance, shall be a part of the criteria of this sub-section.

3. Residential

   a.  Single-family detached and Duplexes

     (1)  Unless stated otherwise within this ordinance, no residential dwellings shall be similar in appearance unless two or more buildings of dissimilar design separate the buildings.

     (2)  A newly constructed residential building shall be dissimilar in appearance to another residential building across the street from, or adjacent to the newly constructed building.

     (3)  A residential dwelling on a corner lot is not considered similar to one adjacent to it if the two dwellings face different streets.

     (4)  On cul-de-sacs not more than two dwellings shall be similar in appearance on any lots having front lot lines contributing to the arc of the cul-de-sac.

     (5)  For the purpose of this section, "similar in appearance" shall mean a residential building, which is identical to another, in combination with any four or more of the following architectural characteristics:

         (a)  Roof type (gable, hip mansard, gambrel, flat, combination).
         (b)  Height of roof ridge above finished grade of property.
         (c)  Dimensions (height and length) and shape of the facades facing the front lot line.
         (d)  Locations and sizes of windows, doors (including garage doors) and ornamental work on the façade facing a front lot line.
         (e)  Type of façade, materials (i.e., brick veneer, lapped horizontal siding, half timber, board and batten, shakes, etc.) on the façade facing a lot line.
         (f)  Porch Dimension and elevation treatment.

     (6)  A building is considered dissimilar when less than four of the above characteristics exist among subject dwellings.

4

# EXHIBIT J

## APPEARANCE CODE

b.    Single-family attached and Multiple-family

The intent of this Ordinance, specifically pertaining to single-family attached and multi-family buildings, is to create a "sense of community". This can be achieved through careful site planning as well as thoughtful building design and color selections.

(1)    The building footprint of single-family attached and multi-family buildings can be the same. However, the façade treatments must vary between buildings that are adjacent to one another. Façade variations may include building materials or colors in any one or more of the following:

      (a)    Siding
      (b)    Masonry
      (c)    Roof
      (d)    Paint/Stain
      (e)    Doors

(2)    Sites where requested setbacks and yards are less than the minimum zoning district requirements must provide an interesting relationship between buildings.

(3)    Parking areas shall be treated with decorative elements, building wall extensions, plantings, berms and other innovative means so as to largely screen parking areas from view from public ways.

(4)    The height and scale of each building shall be compatible with its site and adjoining buildings.

(5)    Newly installed utility services, and service revisions necessitated by exterior alterations, shall be underground.

(6)    The architectural character of the building shall be in keeping with the topographical dictates of the site.

(7)    Masonry Products shall be incorporated on the front facade of at least 75% of the total buildings in the approved community, and shall incorporate a minimum of 50% Premium Siding material on the front facade. No less than half (25% of the total) of the minimum "Premium Siding" requirements must incorporate Masonry Products. Credit toward the remaining "Premium Siding" requirement can be earned via the use of Major Architectural Features. Each Major Architectural Feature used will earn a credit of 10% towards the calculation of the minimum Premium Siding Requirement.

> Example: A building with 30% masonry on the front elevation will require the use of two "major architectural features" (10% + 10%=20%) to comply with the total "50% Premium Siding material on the front façade".

(8)    Pedestrian features/amenities, such as covered walkways, street furniture, and bicycle rack facilities are encouraged.

5

# EXHIBIT J

## APPEARANCE CODE

(9)     Common open space and outdoor features are encouraged.

4.  Non-Residential

    a.    General Provisions

        (1)    Relationship of Buildings to Site

            (a)    The site shall be planned to accomplish a desirable transition with the streetscape, and to provide for adequate planting, pedestrian movement, and parking area.

            (b)    Site planning in which setbacks and yards are in excess of the minimum zoning district requirement is encouraged to provide an interesting relationship between buildings.

            (c)    Newly installed utility services, and service revisions necessitated by exterior alterations, shall be underground.

            (d)    The architectural character of the building shall be in keeping with the topographical dictates of the site.

            (e)    In relating buildings to the site, the provisions of the Zoning Ordinance in regard to bulk regulations, standards, and off-street parking shall be part of this criteria. This shall also apply to sub-section 2 which follows.

        (2)    Relationship of Site to Adjoining Area

            (a)    Adjacent buildings of different architectural styles shall be made compatible by such means as screens, site breaks and materials.

            (b)    Attractive landscape transition to adjoining properties shall be provided.

            (c)    Harmony in texture, lines and masses is required.

            (d)    The height and scale of each building shall be compatible with its site and adjoining buildings.

5

# EXHIBIT J

### APPEARANCE CODE

b.    Building Design

(1)    Commercial, Office and Institutional Uses

    (a)    Guidelines for sites that have existing buildings

        1.    When adding an addition, distinct color variation to an existing building is prohibited.

        2.    When a site abuts a county, state or federal highway, and when an existing building is modified, the property owner shall be required, to the greatest extent possible, to meet the standards set forth below for the entire building.

        3.    If an additional building(s) is placed on the site, the additional building(s) shall, to the greatest extent possible, compliment the architectural style of the principal building.

        4.    Any additional building(s) placed on the site shall, to the greatest extent possible, compliment the materials and/or colors of the principal building on the site.

    (b)    Guidelines for unbuilt sites

    (1)    Masonry Products or Pre-Cast shall be incorporated on at least 50% of the total building, as broken down as follows: The front façade shall itself incorporate Masonry Products or Pre-Cast concrete on at least 50% of the façade. Any other façade that abuts a street shall incorporate Masonry Products. The use Masonry Products or Pre-Cast concrete is encouraged on the remaining facades.

    (2)    Creative layout and design of the buildings within the commercial, office or institutional development is encouraged. Use of windows or the impression of windows on all sides of the building and the utilization of a campus-style layout are encouraged. Creative layout and design will help to decrease the overall mass of the development, to prevent monotony, and to improve the aesthetic quality of the development.

    (3)    The height and scale of each building shall be compatible with its site and adjoining buildings.

    (4)    Outlots shall reflect the style, materials, and/or design elements of the main building. In cases where the main building does not meet the design guidelines and standards (i.e., in terms of visual design materials and layout of the building), new outlot development proposals will be reviewed using the guidelines and standards contained in this document.

7

# EXHIBIT J

## APPEARANCE CODE

(5)    Pedestrian scale features/amenities, such as solid-colored awnings, covered walkways, windows, street furniture, bicycle rack facilities and clearly defined entranceways are encouraged.

(6)    Common open space and outdoor seating areas are encouraged within commercial, office and institutional developments.

(7)    The location of parking lots in a manner that is logical, safe and pedestrian friendly is encouraged. In this respect, the location of parking lots in the rear or side of a building is encouraged.

(8)    Parking areas shall be treated with decorative elements, building wall extensions, plantings, berms and other innovative means so as to largely screen parking areas from view of public ways.

(9)    The location of drive-through facilities, including drive-through lanes, bypass lanes, and service windows, adjacent to a public right-of-way are not desirable and are discouraged.

(10)   Loading bays for commercial and office uses shall not be located in the front of a building or in the area abutting a public right-of-way.

(c)    Standards

(1)    All commercial, office and institutional buildings shall consist of solid and durable façade materials and be compatible with the character and scale of the surrounding area.

(2)    Masonry Products shall not be painted.

(3)    Trash enclosures shall be located in areas that are easily accessible by service vehicles, but minimally exposed to the public street. Screening these enclosures with a material that is compatible with the principal commercial, office or institutional building is required.

(4)    Rooftop mechanicals shall be screened and enclosed in a manner that masks the equipment from view from all sides and is of the same character and design as the structure. Architectural features such as parapet walls and varying rooflines, are encouraged. Ground level mechanicals shall be screened by landscaping and/or fencing, as appropriate and shall be maintained year round.

(5)    When loading bays are placed where they can be viewed from a County, State or Federal highway or from a City street designated on the Comprehensive Plan as an arterial or collector road, landscaping between the building and the street shall be such that within five (5) years of installing the landscaping, it can be reasonably assumed that the bay doors will screened from the road.

8

# EXHIBIT J

## APPEARANCE CODE

5.   Industrial Uses

   a.   Guidelines

   (1) Masonry Products or Pre-Cast concrete shall be incorporated on at least 50% of the total building, as broken down as follows: The front façade (defined as that façade that faces a street that includes a main entry to the building) shall itself incorporate Masonry Products or Pre-Cast concrete on at least 50% of the façade. Any other façade that abuts a street shall incorporate Masonry Products or Pre-Cast concrete. The use of Masonry Products or Pre-Cast concrete is encouraged on the remaining facades. Where pre-cast concrete panels or split-face block is utilized, the use of colors, patterns, or other architectural features within these panels/blocks is encouraged.

   (2) Building entryways shall be clearly identified. Building components, such as windows, doors, eaves and parapets shall be in proportion to one another.

   (3) The location of parking lots in a manner that is logical, safe, and pedestrian friendly is encouraged. In this respect, the location of parking lots in the rear or side of a building is encouraged.

   (4) Loading bays for industrial uses may be placed along the front of the building or the side(s) abutting a public right-of-way when there is an industrial use across from that façade. Otherwise, loading bays for industrial uses shall be discouraged from being placed in the front of the building or in the area abutting a public right-of-way. When loading bays are placed where they can be viewed from a County, State or Federal highway or from a City street designated on the Comprehensive Plan as an arterial or collector road, landscaping between the building and the street shall be such that within five (5) years of installing the landscaping, it can be reasonably assumed that the bay doors will screened from the road.

# EXHIBIT J

## APPEARANCE CODE

b.   Standards

(1)   Industrial buildings shall consist of solid and durable façade materials and be compatible with the character and scale of the surrounding area.

(2)   Industrial buildings with facades greater than 100 feet in length shall incorporate recesses, projections, windows or other ornamental/architectural features along at least thirty percent (30%) of the length of the façade abutting a public street in an effort to break up the mass of the structure.

(3)   Trash enclosures shall be located in areas that are easily accessible by service vehicles but minimally exposed to the public street. Screening these enclosures with a material that is compatible with the principal industrial building is required.

(a)   Rooftop mechanicals shall be screened and enclosed in a manner that masks the equipment from view from all sides and is of the same character and design as the structure. Architectural features such as parapet walls and varying rooflines are encouraged. Ground level mechanicals shall be screened by landscaping and/or fencing, as appropriate.

6.   Signs

The provisions of this section are meant to supplement the City's Sign Code. All provisions of the Sign Code are in full force. Where conflicts between the two regulations may occur, the more stringent requirement will apply.

Wall signs shall be part of the architectural concept. Size, color, lettering, location and arrangement shall be harmonious with the building design, and shall be compatible with signs on adjoining buildings.

10

# EXHIBIT K

FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB

8/31/06

## Exhibit AAA - 1: Overall Infrastructure Funding Summary
### SW INFRASTRUCTURE FUNDING
### United City of Yorkville, Kendall Co., IL

| | Construction Estimate | Engineering | | | | Total Cost | Total Front Funding |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Preliminary | Design | Construction | Subtotal | | |
| **Water** | | | | | | | |
| F.1 - Well No. 13 | $ 704,000 | $ - | $ 40,000 | $ 62,000 | $ 102,000 | $ 806,000 | $ 40,000 |
| F.2 - Well No. 13 WTP | $ 2,893,880 | $ - | $ 190,000 | $ 175,000 | $ 365,000 | $ 3,258,880 | $ 190,000 |
| F.3 - Green Briar Drive Water Main Extension | $ 591,375 | $ - | $ 44,353 | $ 44,353 | $ 88,706 | $ 680,081 | $ 44,353 |
| F.4 - 2.0 MG EWST | $ 3,564,000 | $ - | $ 105,000 | $ 116,500 | $ 221,500 | $ 3,785,500 | $ 105,000 |
| F.5 - BP/PRV Station (Chally Farm) | $ 500,500 | $ - | $ 40,000 | $ 35,000 | $ 75,000 | $ 575,500 | $ 40,000 |
| Additional Consultation, Surveying & Testing | $ - | $ - | $ 70,000 | $ - | $ 70,000 | $ 70,000 | $ 70,000 |
| **Water Subtotal:** | $ 8,253,755 | $ - | $ 489,353 | $ 432,853 | $ 922,206 | $ 9,175,961 | $ 489,353 |
| **Transportation** | | | | | | | |
| Green Briar Road R.O.W. Acquisition | $ 672,000 | $ 20,000 | $ - | $ - | $ 20,000 | $ 692,000 | $ 20,000 |
| F.8 - Fox Road Resurfacing | $ 504,260 | $ - | $ 30,000 | $ 40,000 | $ 70,000 | $ 574,260 | $ 30,000 |
| Pavillion Road Improvements | $ 1,187,549 | $ - | $ 95,004 | $ 95,004 | $ 190,008 | $ 1,377,557 | $ 95,004 |
| Additional Consultation, Surveying & Testing | $ - | $ 5,000 | $ 10,000 | $ 47,502 | $ 62,502 | $ 62,502 | $ 15,000 |
| **Transportation Subtotal:** | $ 2,363,809 | $ 25,000 | $ 135,004 | $ 182,506 | $ 342,510 | $ 2,706,319 | $ 160,004 |
| **Sanitary Sewer** | | | | | | | |
| Contract No. 1 & 2 | $ 5,161,080 | $ - | $ 325,000 | $ 341,500 | $ 666,500 | $ 5,827,580 | $ 325,000 |
| **Sanitary Sewer Subtotal:** | $ 5,161,080 | $ - | $ 325,000 | $ 341,500 | $ 666,500 | $ 5,827,580 | $ 325,000 |
| **Stormwater** | | | | | | | |
| SW Planning Area Stormwater Study | $ - | $ 33,800 | $ - | $ - | $ 33,800 | $ 33,800 | $ 33,800 |
| **Stormwater Subtotal:** | $ - | $ 33,800 | $ - | $ - | $ 33,800 | $ 33,800 | $ 33,800 |
| **TOTAL (Water, Trans., San., & Storm):** | $ 15,778,644 | $ 58,800 | $ 949,357 | $ 956,859 | $ 1,965,016 | $ 17,743,660 | $ 1,008,157 |

G:\Public\Yorkville\2004\YO0402 Fox Road Water System Extension Analysis\Eng\SSA Tables\Development Funding Summary (W BP+PRV Recapt).xls\Project Sum.

ENGINEERING ENTERPRISES, INC.
SUGAR GROVE, IL

8/3/06

## Exhibit AAA - 2:  Funding Distribution Summary
### SW INFRASTRUCTURE FUNDING
### United City of Yorkville, Kendall Co., IL

**SW INFRASTRUCTURE FUNDING SUMMARY**

| Funding Entity | Acreage | Total Single Family Dwelling Units (DU) | Density (DU/Acre) | Percent of Total DU | Water Impr. Subtotal Cost | Cost/ D.U. | Transportation Impr. Subtotal Cost | Cost/ D.U. | Sanitary Impr. Subtotal Cost | Cost/ D.U. | Stormwater Planning Subtotal Cost | Cost/ D.U. | TOTAL ALL Total Cost | Cost/ D.U. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| United City of Yorkville | -- | -- | -- | -- | $1,990,881 | -- | -- | -- | -- | -- | $33,800 | -- | $1,990,881 | -- |
| Silver Fox | 103 | 172 | 1.67 | 19.7% | $1,412,381 | 8,212 | $441,364 | 2,566 | $1,084,910 | 6,308 | 5,691 | 33 | $2,944,346 | 17,118 |
| Evergreen Farm | 49 | 77 | 1.57 | 8.8% | $632,287 | 8,212 | $458,488 | 5,954 | $496,339 | 6,446 | 2,715 | 35 | $1,589,830 | 20,647 |
| Aspen Ridge Estates | 126 | 217 | 1.72 | 24.8% | $1,781,900 | 8,212 | $755,945 | 3,488 | $1,356,178 | 6,250 | 6,982 | 32 | $3,902,005 | 17,982 |
| Chaly Farm | 154 | 224 | 1.45 | 25.6% | $1,839,381 | 8,212 | $574,799 | 2,566 | $1,484,251 | 6,626 | 8,533 | 38 | $3,906,964 | 17,442 |
| York Wood Estates | 178 | 185 | 1.04 | 21.1% | $1,519,131 | 8,212 | $474,723 | 2,566 | $1,405,901 | 7,599 | 9,880 | 53 | $3,409,635 | 18,430 |
| **Total** | 610 | 875 | 1.43 | 100.0% | $9,175,961 | -- | $2,706,319 | -- | $5,827,580 | -- | 33,800 | -- | $15,752,779 | -- |

**MAXIMUM RECAPTURE/RECOVERY OR ADDITIONAL FEES( NEGATIVE NUMBER) SUMMARY**

| Funding Entity | Acreage | Total Single Family Dwelling Units (DU) | Density (DU/Acre) | Percent of Total DU | Water Impr. Subtotal Cost | Cost/ D.U. | Transportation Impr. Subtotal Cost | Cost/ D.U. | Sanitary Impr. Subtotal Cost | Cost/ D.U. | Stormwater Planning Subtotal Cost | Cost/ D.U. | TOTAL ALL Subtotal Cost | Cost/ D.U. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| United City of Yorkville | -- | -- | -- | -- | $1,990,881 | -- | -- | -- | -- | -- | -- | -- | $1,990,881 | -- |
| Silver Fox | 103 | 172 | 1.67 | 19.7% | $775,981 | 4,512 | $(18,436) | (107) | $379,098 | 2,204 | -- | -- | $1,155,079 | 6,716 |
| Evergreen Farm | 49 | 77 | 1.57 | 8.8% | $347,387 | 4,512 | $(41,689) | (541) | $169,712 | 2,204 | -- | -- | $517,099 | 6,716 |
| Aspen Ridge Estates | 126 | 217 | 1.72 | 24.8% | $979,000 | 4,512 | $(117,488) | (541) | $478,280 | 2,204 | -- | -- | $1,457,280 | 6,716 |
| Chaly Farm | 154 | 224 | 1.45 | 25.6% | $1,010,581 | 4,512 | $(24,010) | (107) | $493,709 | 2,204 | -- | -- | $1,504,289 | 6,716 |
| York Wood Estates | 178 | 185 | 1.04 | 21.1% | $834,631 | 4,512 | $(19,829) | (107) | $407,761 | 2,204 | -- | -- | $1,242,382 | 6,716 |
| **Total** | 610 | 875 | 1.43 | 100.0% | $5,938,461 | -- | $(221,451) | -- | $1,928,550 | -- | -- | -- | $7,867,011 | -- |

**TOTAL DEDICATED INFRASTRUCTURE FUNDING SUMMARY (INFRASTRUCTURE FUNDING+MAXIMUM RECAPTURE/RECOVERY AMOUNT)**

| Funding Entity | Acreage | Total Single Family Dwelling Units (DU) | Density (DU/Acre) | Percent of Total DU | Water Impr. Subtotal Cost | Cost/ D.U. | Transportation Impr. Subtotal Cost | Cost/ D.U. | Sanitary Impr. Subtotal Cost | Cost/ D.U. | Stormwater Planning Subtotal Cost | Cost/ D.U. | TOTAL ALL Subtotal Cost | Cost/ D.U. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| United City of Yorkville | -- | -- | -- | -- | $-- | -- | -- | -- | -- | -- | -- | -- | $-- | -- |
| Silver Fox | 103 | 172 | 1.67 | 19.7% | $636,400 | 3,700 | $459,800 | 2,673 | $705,812 | 4,104 | 5,691 | 33 | $1,807,702 | 10,510 |
| Evergreen Farm | 49 | 77 | 1.57 | 8.8% | $284,900 | 3,700 | $500,177 | 6,496 | $326,627 | 4,242 | 2,715 | 35 | $1,114,419 | 14,473 |
| Aspen Ridge Estates | 126 | 217 | 1.72 | 24.8% | $802,900 | 3,700 | $874,433 | 4,030 | $877,898 | 4,046 | 6,982 | 32 | $2,562,212 | 11,807 |
| Chaly Farm | 154 | 224 | 1.45 | 25.6% | $828,800 | 3,700 | $598,809 | 2,673 | $990,542 | 4,422 | 8,533 | 38 | $2,426,684 | 10,833 |
| York Wood Estates | 178 | 185 | 1.04 | 21.1% | $684,500 | 3,700 | $494,552 | 2,673 | $998,151 | 5,395 | 9,880 | 53 | $2,187,082 | 11,822 |
| **Total** | 610 | 875 | 1.43 | 100.0% | $3,237,500 | -- | $2,927,770 | -- | $3,899,030 | -- | 33,800 | -- | $7,865,768 | -- |

**Notes:**
The acreage and unit counts are estimations. Once the final acreage and unit counts have been established, the calculation methodology will be retain and the values will be adjusted accordingly.

Exhibit AAA - 3: Water Works System Improvements Funding Distribution
SW INFRASTRUCTURE FUNDING
United City of Yorkville, Kendall Co., IL

## WATER DISTRIBUTION FUNDING SUMMARY

| Funding Entity | Acreage | Total Single Family Units (DU) | Density (DU/Acre) | Percent of Total DU | Water Distr. Funding At $1,435 / DU | Water Connection Fee At $3,700 / DU | Additional Supply, Treatment & Storage At $3,077 / DU | Total Fees For Water Improvements | Water Improvement Cost per DU |
|---|---|---|---|---|---|---|---|---|---|
| United City of Yorkville | -- | -- | -- | -- | -- | -- | -- | $1,990,881 | -- |
| Silver Fox | 103 | 172 | 1.67 | 19.7% | $246,811 | $636,400 | $529,170 | $1,412,381 | $8,212 |
| Evergreen Farm | 49 | 77 | 1.57 | 8.6% | $110,491 | $284,900 | $236,896 | $632,287 | $8,212 |
| Aspen Ridge Estates | 126 | 217 | 1.72 | 24.9% | $311,384 | $602,900 | $667,616 | $1,781,900 | $8,212 |
| Chally Farm | 154 | 224 | 1.45 | 25.6% | $321,429 | $828,800 | $689,152 | $1,839,381 | $8,212 |
| York Wood Estates | 178 | 185 | 1.04 | 21.1% | $265,466 | $684,500 | $569,165 | $1,519,131 | $8,212 |
| Total / Average | 610 | 875 | 1.43 | 100.0% | $1,255,581 | $3,237,500 | $2,691,999 | $9,175,981 | -- |

## POTENTIAL MAXIMUM RECAPTURE/RECOVERY AMOUNT SUMMARY

| Off-site Water Main Project / Infrastructure Item | Total Project Cost | Less Water Conn. Fee At $3,700 / DU | Less City Contr. | Maximum Recoverable Amount (Dev.) | Recovery per D.U. |
|---|---|---|---|---|---|
| Well No. 13 | $906,000 | | | | |
| Well No. 13 WTP | $3,200,880 | | | | |
| 2.0 MG EWST | $3,815,500 | | | | |
| Supply, Treatment, & Storage Subtotal: | $7,920,380 | $3,237,500 | $1,990,881 | $2,691,999 | $3,077 |
| Green Briar Road WM | $680,081 | -- | | $680,081 | $777 |
| BP / FRV Station | $575,500 | -- | | $575,500 | $658 |
| Distribution Subtotal: | $1,255,581 | -- | | $1,255,581 | $1,435 |
| Total: | $9,175,981 | $3,237,500 | $1,990,881 | $3,947,580 | $4,512 |

| Development | Total Single Family Units (DU) | Recovery per D.U. | Maximum Recoverable Amount |
|---|---|---|---|
| United City of Yorkville | -- | -- | $1,990,981 |
| Silver Fox | 172 | $4,512 | $775,981 |
| Evergreen Farm | 77 | $4,512 | $347,387 |
| Aspen Ridge Estates | 217 | $4,512 | $979,020 |
| Chally Farm | 224 | $4,512 | $1,010,581 |
| York Wood Estates | 185 | $4,512 | $834,631 |
| Total / Average | 875 | $4,512 | $5,938,481 |

ENGINEERING ENTERPRISES, INC.
SUGAR GROVE, IL

## Exhibit AAA - 4: Transportation Improvements Funding Distribution
### SW INFRASTRUCTURE FUNDING
### United City of Yorkville, Kendall Co., IL

**TRANSPORTATION FUNDING SUMMARY**

| Funding Entity | Acreage | Total Single Family Units (DU) | Density (DU/Acre) | Percent of Total DU | Transportation Infrastructure Fee At $2,000 / DU | Transportation Improvement Cost per DU |
|---|---|---|---|---|---|---|
| Silver Fox | 103 | 172 | 1.67 | 19.7% | $344,000 | $2,000 |
| Evergreen Farm | 49 | 77 | 1.57 | 8.8% | $154,000 | $2,000 |
| Aspen Ridge Estates | 126 | 217 | 1.72 | 24.8% | $434,000 | $2,000 |
| Chally Farm | 154 | 224 | 1.45 | 25.6% | $448,000 | $2,000 |
| York Wood Estates | 178 | 185 | 1.04 | 21.1% | $370,000 | $2,000 |
| Total / Average | 610 | 875 | 1.43 | 100.0% | $1,750,000 | -- |

G:\Public\Yorkville\2006\YO0452 Fee Road Water System Extension Analysis\[English Development Funding Summary (W-BP-FRV Recap1).xls]Transportation

**POTENTIAL MAXIMUM RECAPTURE/RECOVERY AMOUNT SUMMARY**

| Transportation Improvement | Total Project Cost | Portion Of Transpor. Impact Fee At 2,000 / DU | Remaining Transpor. Impact Fee | Fees per D.U. |
|---|---|---|---|---|
| Green Briar Road R.O.W. Acq. | $702,000 | -- | -- | -- |
| Fox Road Resurfacing | $574,260 | -- | -- | -- |
| Subtotal: | $1,276,260 | $1,276,260 | -- | $1,459 |
| Pavilion/Fox Road Improvements: | $1,430,059 | -- | -- | -- |
| Less County Impact Fee Contribution: | ($589,097) | -- | -- | -- |
| Pavilion Local Funding Subtotal: | $840,962 | -- | -- | -- |
| Pavilion Road (30% Regional Share) | $252,289 | $252,289 | -- | $434 |
| Pavilion Road (70% Adjacent Share) | $588,673 | -- | -- | * |
| Total (Silver, Chally, York) | $1,099,725 | $1,162,000 | ($62,275) | ($107) |
| Total (Evergreen) | $406,848 | $154,000 | ($41,660) | ($541) |
| Total (Aspen) | $610,849 | $434,000 | ($117,489) | ($541) |

| Development | Total Single Family Dwelling Units (DU) | Remaining Fees per DU | Remaining Transpor. Impact Fees |
|---|---|---|---|
| Silver Fox | 172 | ($107) | ($18,436) |
| Evergreen Farm | 77 | ($541) | ($41,660) |
| Aspen Ridge Estates | 217 | ($541) | ($117,489) |
| Chally Farm | 224 | ($107) | ($24,010) |
| York Wood Estates | 185 | ($107) | ($19,829) |
| Total: | 876 | -- | ($221,451) |

**Notes:**

- 70% of the Pavilion Road improvement cost is applied to Aspen Ridge and Evergreen Farms. 30% (assumed regional portion of the improvement) is applied to the remaining subdivisions
- It is assumed Evergreen Farm and Aspen Ridge do not recover dollars from their Pavilion Road investment
- Of the four legs of the Pavilion Road improvement with reference to the Fox and Pavilion intersection, the cost breakout for the 70% of the total portion that is applied to Evergreen Farms and Aspen Ridge is as follows: North and East - 100% Evergreen Farms, West - 100% Aspen Ridge, South - 50% each
- The total cost for the regional (Non-County Impact Fee eligible) improvements is less than the total amount of money that will be collected for the $2,000 / D.U. impact fee. The remaining portion of the impact fee will be due at building permit.
- Since Evergreen Farm and Aspen Ridge are not funding the "Regional Share" of Pavilion Road (they are funding the adjacent share), their transportation impact fee does not count against that portion of the improvement

ENGINEERING ENTERPRISES, INC.
SUGAR GROVE, IL

Exhibit AAA - 5:  Sanitary Conveyance Improvements Funding Distribution
SW INFRASTRUCTURE FUNDING
United City of Yorkville, Kendall Co., IL

SANITARY CONVEYANCE FUNDING SUMMARY

| Funding Entity | Acreage | Total Single Family Units (DU) | Density (DU/Acre) | Percent of Total DU | YBSD Infrastructure Fee At $3,523 / Acre | City Connection Fee At $2,000 / Unit | Additional Funding Required At $2,204 / DU | Total Fees For Sanitary Improvements | Sanitary Improvement Cost per DU |
|---|---|---|---|---|---|---|---|---|---|
| Silver Fox | 103 | 172 | 1.67 | 19.7% | $351,812 | $344,000 | $379,098 | $1,084,910 | $6,308 |
| Evergreen Farm | 49 | 77 | 1.57 | 8.8% | $172,627 | $154,000 | $169,712 | $496,339 | $6,446 |
| Aspen Ridge Estates | 126 | 217 | 1.72 | 24.8% | $443,898 | $434,000 | $478,280 | $1,356,178 | $6,250 |
| Chally Farm | 154 | 224 | 1.45 | 25.6% | $542,542 | $448,000 | $493,709 | $1,484,251 | $6,626 |
| York Wood Estates | 178 | 185 | 1.04 | 21.1% | $626,151 | $370,000 | $407,751 | $1,405,901 | $7,589 |
| Total / Average | 610 | 875 | 1.43 | 100.0% | $2,149,030 | $1,750,000 | $1,928,550 | $5,827,580 | -- |

G:\Folder\Yorkville\2004\YO0452 Fox Road Water System Extension Analysis\Eng\BSA Tables\Development Funding Summary [W SF-PRV Recap1].xls[Sanitary [W SF-PRV Recap1].xls]Sanitary

POTENTIAL MAXIMUM RECAPTURE AMOUNT SUMMARY

| Sanitary Interceptor Contract | Estimated Project Cost | Less YBSD Infr. Fee At $3,523 / Acre | Less City Conn. Fee At $2,000 / DU | Maximum Recoverable Amount | Recovery per D.U. |
|---|---|---|---|---|---|
| Contract Nos. 1 + 2 | $5,827,580 | $2,149,030 | $1,750,000 | $1,928,550 | $2,204 |
| Total / Average | $5,827,580 | $2,149,030 | $1,750,000 | $1,928,550 | $2,204 |

| Development | Total Single Family Dwelling Units (DU) | Recovery per D.U. | Maximum Recoverable Amount |
|---|---|---|---|
| Silver Fox | 172 | $2,204 | $379,098 |
| Evergreen Farm | 77 | $2,204 | $169,712 |
| Aspen Ridge Estates | 217 | $2,204 | $478,280 |
| Chally Farm | 224 | $2,204 | $493,709 |
| York Wood Estates | 185 | $2,204 | $407,751 |
| Total / Average | 875 | -- | $1,928,550 |

ENGINEERING ENTERPRISES, INC.
SUGAR GROVE, IL

**Exhibit BBB: Front Funding Distribution Summary**
SW INFRASTRUCTURE FUNDING
United City of Yorkville, Kendall Co., IL

8/31/06

| Funding Entity | Acreage | Total Single Family Dwelling Units (DU) | Density (DU/Acre) | Percent of Total DU | Water Impr. | | Transportation Impr. | | Sanitary Impr. | | Stormwater Planning | | TOTAL ALL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Subtotal Cost | Front Funding Amount | Subtotal Cost | Front Funding Amount | Subtotal Cost | Front Funding Amount | Subtotal Cost | Front Funding Amount | Total Cost | Front Funding Amount |
| Silver Fox | 103 | 172 | 1.67 | 19.7% | $ 1,412,381 | $ 96,193 | $ 441,364 | $ 26,094 | $ 1,084,910 | $ 60,505 | $ 5,691 | $ 5,691 | $ 2,944,346 | $ 188,483 |
| Evergreen Farm | 49 | 77 | 1.57 | 8.8% | $ 632,287 | $ 43,063 | $458,488 | $ 27,107 | $ 498,339 | $ 27,680 | $ 2,715 | $ 2,715 | $ 1,589,830 | $ 100,566 |
| Aspen Ridge Estates | 126 | 217 | 1.72 | 24.8% | $ 1,781,900 | $ 121,360 | $756,945 | $ 44,752 | $ 1,356,178 | $ 75,633 | $ 6,982 | $ 6,982 | $ 3,902,005 | $ 248,727 |
| Chali Farm | 154 | 224 | 1.45 | 25.6% | $ 1,839,381 | $ 125,274 | $ 574,769 | $ 33,983 | $ 1,484,251 | $ 82,776 | $ 8,533 | $ 8,533 | $ 3,906,964 | $ 250,567 |
| York Wood Estates | 178 | 185 | 1.04 | 21.1% | $ 1,519,131 | $ 103,463 | $ 474,723 | $ 28,067 | $ 1,405,901 | $ 78,406 | $ 9,880 | $ 9,880 | $ 3,409,635 | $ 219,816 |
| **Total** | 610 | 875 | 1.43 | 100.0% | $ 7,185,080 | $ 489,353 | $ 2,706,319 | $ 160,004 | $ 5,827,580 | $ 325,000 | $ 33,800 | $ 33,800 | $ 15,752,779 | $ 1,008,157 |

**Notes:**
The acreage and unit counts are estimates. Once the final acreage and unit counts have been established, the calculation methodology will be rerun and the values will be adjusted accordingly.
The *Front Funding Amount* for each infrastructure component is computed by using the proportional share of the *Subtotal Cost* multiplied by the total front funding amount required.

ENGINEERING ENTERPRISES, INC.
SUGAR GROVE, IL

EXHIBIT ___: PRELIMINARY SCHEDULE

SW INFRASTRUCTURE IMPROVEMENTS

United City of Yorkville, Kendall Co., IL

9/5/06

| CONTR. NO. | PROJECT(S) | WORK ITEMS | 2006 J J A S O N D | 2007 J F M A M J J A S O N D | 2008 J F M A M J J |
|---|---|---|---|---|---|
| **WATER IMPROVEMENTS** | | | | | |
| F.1 | Well No. 13 | Site Selection/Acquisition | | | |
| | | Design | | | |
| | | IEPA Plan Review | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| | | Sampling and Testing | | | |
| F.2 | Well No. 13 WTP | Site Selection/Acquisition | | | |
| | | Design | | | |
| | | IEPA Plan Review | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| F.3 | Green Briar Road WM | Easement Acquisition | | | |
| | | Design | | | |
| | | IEPA Plan Review | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| F.4 | 2.0 MG Elevated Water Storage Tank (EWST) | Site Selection/Acquisition | | | |
| | | Design | | | |
| | | IEPA Plan Review | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| F.5 | Booster Pump/Pressure Reducing Valve Station | Site Selection/Acquisition | | | |
| | | Design | | | |
| | | IEPA Plan Review | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| **TRANSPORTATION IMPROVEMENTS** | | | | | |
| F.6 | Green Briar Road Ext. | R.O.W. Acquisition | | | |
| F.7 | Fox Road Resurfacing | Design | | | |
| | | Plan Review | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| F.8 | Pavillion Road Improvements | R.O.W. Acquisition | | | |
| | | Preliminary Engineering | | | |
| | | Design | | | |
| | | Plan Review | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| **SANITARY SEWER IMPROVEMENTS (ENGINEERING BY WALTER E. DEUCHLER ASSOCIATES)** | | | | | |
| 1 | Contract 1 | Design (revisions) | | | |
| | | R.R. Permit/Easements | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| 2 | Contract 2 | Design | | | |
| | | Easement Acquisition | | | |
| | | IEPA and Other Permits | | | |
| | | Bidding and Contracting | | | |
| | | Construction | | | |
| **STORMWATER PLANNING** | | | | | |
| -- | SW Planning Area Stormwater Study | Report Preparation | | | |
| | | Review | | | |
| | | Report Finalization | | | |

C:\Documents and Settings\tmiller\Local Settings\Temporary Internet Files\OLKD\Infrastructure Schedule1.xls\Annexation Agreements 9-6-06

**LEGEND**
- Prelim. Eng./Report Work
- Site Selection/Acquisition
- Easement Negotiation
- Design
- Agency Review
- Bidding and Contracting
- Construction
- Sampling and Testing

**Notes**
- Design initiation assumes that the site geometry, proposed topography, and utility connection information is available.
- Construction initiation assumes all required easements are received, and R.O.W. is acquired.
- The schedule assumes power will be available at all of the sites at least one month prior to the WTP being placed on-line.
- The schedule assumes that the connecting water main, storm and/or sanitary sewers will be extended to the site(s) at least one month prior to the WTP and EWST being placed on-line.
- Electric service for the traffic signals needs to be initiated during the design phase.



Engineering Enterprises, Inc.



EXHIBIT DDD



EXHIBIT EEE                                        *DRAFT - AUGUST 23, 2006*

## REBATE AGREEMENT

THIS REBATE AGREEMENT ("Agreement"), is made and entered into this _____ day of _____, 2006 by and between the UNITED CITY OF YORKVILLE, an Illinois municipal corporation ("CITY") and ASPEN RIDGE ESTATES, L.L.C. ("DEVELOPER").

A.    The DEVELOPER is the owner and developer of that certain real estate development located within the corporate limits of the CITY and known as Aspen Ridge Estates ("Subdivision").

B.    The DEVELOPER and the CITY have heretofore entered into that certain Annexation Agreement dated _____, 2006 ("Annexation Agreement") pertaining to the annexation and development of the Subdivision within the CITY.

C.    The DEVELOPER has agreed to pay the CITY an amount in excess of the CITY'S normal and customary water connection fee in effect at the time of the execution of the Annexation Agreement ("Excess Water Fee") and an amount in excess of the CITY'S normal and customary sanitary sewer connection fee in effect at the time of the execution of the Annexation Agreement ("Excess Sanitary Sewer Fee") (collectively, the Excess Water Fee and Excess Sanitary Sewer Fee are hereinafter referred to as the "Excess Fees") to assist the CITY in paying for the construction of certain municipal improvements designed to serve the CITY on a regional basis.

D.    The current Excess Fees to be paid by the DEVELOPER are based upon a pro rata share per dwelling unit of the estimated cost to construct the regional water works and sanitary conveyance systems and the parties recognize that the Excess fees for which the DEVELOPER is entitled to rebate shall be adjusted to reflect the actual costs of construction for such improvements. The current estimated cost to construct the water work system improvements is $9,175,961.00 and the sanitary conveyance improvements is $5,827,580.00.

E.    The DEVELOPER and the CITY are desirous of entering into this Agreement whereby, pursuant to its municipal police powers and Section 11-15-16 of the City Code, the CITY agrees to rebate to the DEVELOPER the amount equal to the difference between the Excess Fees and the normal and customary water connection and sanitary sewer connection fees in effect at the time of the execution of the Annexation Agreement ("Total Rebate Amount").

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby agree as follows:

1.    **RECITALS.** The foregoing recitals are incorporated herein as if fully set forth and shall constitute substantive provisions of this Agreement.

QBCHI\471303.3

EXHIBIT EEE                                    *DRAFT - AUGUST 23, 2006*

2.    <u>TOTAL REBATE AMOUNT</u>.  The CITY pledges and agrees to rebate to the DEVELOPER from the Reimbursement Fees (defined below) the Total Rebate Amount together with interest accrued thereon.  The Total Rebate Amount shall be calculated as set forth below.  The CITY covenants and agrees that during the term of this Agreement or until such time as the DEVELOPER has been paid the Total Rebate Amount together with accrued interest thereon, the CITY shall not further encumber or pledge the Reimbursement Fees or take any action inconsistent with the terms and interest of this Agreement, and the CITY agrees that the Reimbursement Fees shall not be used for any purpose whatsoever, except to pay the DEVELOPER the Total Rebate Amount together with accrued interest thereon.  Interest shall accrue for each calendar year or portion thereof on the Total Rebate Amount at the prime interest rate in effect on January 1st of each year as published in the Wall Street Journal Midwest Edition, or if such rate is not determined on that date then on the next business day thereafter, from the date of this Agreement until the DEVELOPER has been fully reimbursed the Total Rebate Amount.

A.  <u>Water Fee Rebate Amount</u>:  The CITY agrees to rebate to the DEVELOPER an amount equal to the difference between the Excess Water Fee paid by the DEVELOPER to the CITY based on the actual costs of construction and the normal and customary water connection fee in effect at the time of the execution of the Annexation Agreement ("Water Fee Rebate Amount").  For example only and in no way as a means of limitation, the Water Fee Rebate Amount based on the estimated costs of construction is calculated as forth below:

Excess Water Fee Per Dwelling Unit Based on the Estimated Costs of Construction

|  |  |
|---|---:|
| | $8,212.00 |
| Normal and Customary Water Connection Fee Per Dwelling Unit | ($3,700.00) |
| Per Dwelling Unit Rebate Amount | $4,512.00 |

Water Fee Rebate Amount ($4,512.00 x 217 dwelling units) =    **$979,104.00**

B.  <u>Sanitary Sewer Fee Rebate Amount</u>:  The CITY agrees to rebate to the DEVELOPER an amount equal to the difference between the Excess Sanitary Sewer Fee paid by the DEVELOPER to the CITY based on the actual costs of construction and the normal and customary sanitary sewer connection fee and Yorkville Bristol Sanitary District ("YBSD") infrastructure fee in effect at the time of the execution of the Annexation Agreement("Sanitary Sewer Fee Rebate Amount").  For example only and in no way as a means of limitation, the Sanitary Sewer Fee Rebate Amount based on the estimated costs of construction is calculated as forth below:

Excess Sanitary Sewer Fee Per Dwelling Unit Based on the Estimated Costs of Construction

$6,250.00

EXHIBIT EEE                                        *DRAFT - AUGUST 23, 2006*

Total Excess Sanitary Sewer Fee ($6,250.00 x 217 dwelling units) =
$1,356,250.00

Normal and Customary Sanitary Sewer Fee Per Dwelling Unit    $2,000.00
Total Sanitary Sewer Fee ($2,000.00 x 217 dwelling units)= ($434,000.00)

Normal and Customary YBSD Fee Per Acre                       $3,523.00
Total YBSD Fee ($3,523.00 x 126 acres) =                     ($443,898.00)

Sanitary Sewer Fee Rebate Amount
[$1,356,250.00 - ($434,000.00 + $443,898.00)] =    **$478,352.00**

C. **Calculation of Total Rebate Amount:** The Total Rebate Amount shall be the sum of the Water Rebate Amount and the Sanitary Sewer Fee Rebate Amount.

3.    **PAYMENT OF TOTAL REBATE.**    The CITY shall reimburse the DEVELOPER the Total Rebate Amount plus all accrued interest by paying to the DEVELOPER, or such other person or entity as the DEVELOPER may direct by written notice to the CITY, any and all fees collected by the CITY after the date of this Agreement related to the following: (i) connection to the CITY'S public water supply system by property located in the Regional Water Improvements Recovery Area as set forth in the attached *Exhibit A*; and (ii) connection to the CITY's sanitary sewer system by property located in the Regional Sanitary Improvements Recovery Area as set forth in attached *Exhibit B* (collectively, "Reimbursement Fees"). The CITY shall make such payment of the Reimbursement Fees to the DEVELOPER within thirty (30) days following receipt thereof by the CITY. The CITY shall not reduce or eliminate the Reimbursement Fees and is obligated to maintain the Reimbursement Fees at such level as to ensure reimbursement of the Total Rebate Amount to the DEVELOPER.

4.    **PAYMENT OF FUTURE CONNECTION FEES.** As a condition of receiving Final Plat approval, or issuance of building permits if no platting is necessary, on any parcel of property sought to be improved or platted within either the Regional Water Improvements Recovery Area or Regional Sanitary Improvements Recovery Area, the owner of such real property shall pay to the CITY a sum equal to the entire amount of water and sanitary sewer connections fees due for all approved dwelling units in the respective development.

5.    **OBLIGATION TO UTILIZE OR TAP-ON TO WATER MAINS AND SANITARY SEWER SYSTEMS.** The CITY shall require the owner of property located in either the Regional Water Improvements Recovery Area or Regional Sanitary Improvements Recovery Area to utilize and tap-on to the water mains and sanitary sewer main systems constructed by the CITY as part of the plat approval or building permit process. If any owner of real property located in either the Regional Water Improvements Recovery Area or Regional Sanitary Improvements Recovery Area fails to utilize or tap-on to the water mains or sanitary sewer systems constructed by the CITY

EXHIBIT EEE                                    *DRAFT - AUGUST 23, 2006*

and avoids payment of the associated connection fees and interest, then the CITY shall be solely responsible for payment of the associated connection fees and interest.

6.     **CITY'S OBLIGATION.**  It is understood and agreed that the CITY's obligation to reimburse the DEVELOPER shall be secured solely by the pledge of the Reimbursement Fees and shall be limited to funds collected from the Reimbursement Fees as provided herein.   This Agreement shall not be construed as creating any obligation upon the CITY to make payments from its general corporate funds or revenue.

7.     **TERM.**  This Agreement shall remain in full force and effect for a period of thirty (30) years from the date hereof, unless sooner terminated by the mutual agreement of the parties hereto or by the completion of all the duties to be performed hereunder.

8.     **SUCCESSORS AND ASSIGNS.**

A. This Agreement shall inure to the benefit of and be binding upon the DEVELOPER and its successor(s) in title and interest, and upon the CITY, and any successor municipalities of the CITY.  It is specifically agreed that the DEVELOPER shall have the right to sell, transfer, lease, and assign all or any part of the Subdivision to other persons, firms, partnerships, corporations, or other entities for building or development purposes (as well as for occupancy) and that such persons, firms, partnerships, corporations, or other entities shall be entitled to the same rights and have the same obligations as the DEVELOPER has under this Agreement.

B. It is understood and agreed that this Agreement constitutes a covenant running with the land and as such, shall be assignable to and binding upon each and every subsequent grantee and successor in interest of the DEVELOPER and the CITY.

C. Nothing contained in this Agreement shall be construed to restrict or limit the right of the DEVELOPER to sell or convey all or any portion of the Subdivision, whether improved or unimproved.

D. The foregoing to the contrary notwithstanding, the obligations and duties of the DEVELOPER hereunder shall not be deemed transferred to or assumed by, any purchaser of a empty lot or a lot improved with a dwelling unit who acquires the same for purchaser's residential occupation, unless otherwise expressly agreed in writing by such purchaser.

E. Upon any sale, transfer or assignment of the PROPERTY, the DEVELOPER shall no longer have any rights or obligations hereunder other than those rights that vested prior to such sale, transfer or obligation.

F. In the event of a sale, transfer or assignment, the CITY shall have no duty to return any portion of any security posted in connection with the portion of the Subdivision so transferred until substitute security acceptable to CITY is received.

QBCHI\471303.3                            4

EXHIBIT EEE                                              *DRAFT - AUGUST 23, 2006*

9.    <u>GENERAL PROVISIONS</u>.

    A.  <u>Entire Agreement</u>:  This Agreement contains all the terms and conditions agreed upon by the parties hereto and no other prior agreement, excepting the Annexation Agreement, regarding the subject matter of this Agreement shall be deemed to exist to bind the parties.

    B.  <u>Amendment and Modifications</u>:  No amendment or modification to this Agreement shall be effective unless and until it is reduced to writing and approved by all parties to this Agreement in accordance with all applicable statutory and ordinance requirements.

    C.  <u>No Third Party Beneficiaries</u>:  No provision of this Agreement is intended to benefit, nor shall any provision of this Agreement benefit, any party, individual or entity other than a party to this Agreement or its respective successor or assign.

    D.  <u>Notices</u>:  All notices shall be in writing and shall be delivered personally or by a nationally recognized overnight courier, prepaid, or shall be sent by registered or certified mail, return receipt requested, postage prepaid, at the following addresses:

| | |
|---|---|
| CITY: | UNITED CITY OF YORKVILLE<br>800 Game Farm Road<br>Yorkville, IL 60560<br>Attn: Mayor<br>Attn: City Administrator |
| copy to: | City Attorney:<br>John J. Wyeth, Esq.<br>800 Game Farm Road<br>Yorkville, IL 60560 |
| OWNER: | Aspen Ridge Estates LLC<br>19250 Everett Lane<br>Suite 101<br>Mokena, Illinois  60448<br>Attn:  Paul Dresden |
| copy to: | Robert L. Gamrath, Esq.<br>Quarles & Brady LLP<br>500 West Madison Street<br>Suite 3700<br>Chicago, Illinois 60661 |

Service shall be deemed to be upon delivery unless delivery is rejected and then service shall be deemed to have occurred upon such rejection.

EXHIBIT EEE                                                    *DRAFT - AUGUST 23, 2006*

E. **Captions and Paragraph Headings:** The captions and paragraph headings used herein are for convenience only and shall not be used in construing any term or provision of this Agreement.

F. **Counterparts:** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

G. **Enforceability:** This Agreement shall be enforceable in the Circuit Court of Kendall County by any of the parties hereto by an appropriate action of law or in equity to secure the performance of the covenants herein contained.

H. **Severability:** The invalidity or unenforceability of any of the provisions hereof shall not affect the validity or enforceability of the remainder of this Agreement or the charges imposed hereunder.

I. **No Waiver or Relinquishment of Right to Enforce Agreement:** Failure of any part to this Agreement to insist upon the strict and prompt performance of the terms, covenants, agreements, and conditions herein contained, or any of them, upon any other party imposed, shall not constitute or be construed as a waiver or relinquishment of any party's rights thereafter to enforce any such term, covenant, agreement, or condition, but the same shall continue in full force and effect.

J. **Exhibits:** Exhibits A and B attached to this Agreement are, by this reference, incorporated in and made a part of this Agreement. In the event of a conflict between an exhibit and the text of this Agreement, the text of this Agreement shall control.

K. **Payment of Claims.** The CITY shall pay and discharge from sources other than the Reimbursement Fees any lawful claims which, if unpaid, might become a lien or charge upon the Reimbursement Fees payable to the DEVELOPER or its designee hereunder. However, nothing herein contained shall require the CITY to make such payments so long as the CITY shall in good faith contest the validity of such claims.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the day and year first above written.

[Signature Page Follows On Next Page]

EXHIBIT EEE

*DRAFT - AUGUST 23, 2006*

CITY:

THE UNITED CITY OF YORKVILLE

By: _____
     Mayor

Attest: _____
      City Clerk

Date of Execution: _____,
2006

DEVELOPER:

ASPEN RIDGE ESTATES LLC

By: _____
    Its: _____

Date of Execution: _____,
2006

<u>**DRAFT**</u>

UNITED CITY OF YORKVILLE, ILLINOIS
KENDALL COUNTY, ILLINOIS
SPECIAL SERVICE AREAS
SERIES 2007 – PAYDOWN BONDS
(Southwest Interceptor Project including Pavillion Road)

<u>Summary of Proposed Terms</u>

**ISSUER:** United City of Yorkville, Illinois (the "City")

**BOND TYPE:** Special Tax Revenue Bonds

**PUBLIC IMPROVEMENTS:** The proceeds of the Bonds will be used by the City to construct certain off-site Public Improvements benefiting the Special Service Areas (the "Areas"). Improvements include roadways (including Pavillion Road) sanitary sewer facilities, water facilities, costs for land and easement acquisitions relating to any of the foregoing improvements and certain soft costs associated with the Public Improvements.

**THE AREAS:** The City will form five separate special service areas (the "Areas"), each of which will have a separate and distinct tax based on the number of acres and dwelling units. As currently contemplated, the special service areas will be:

| | Acreage* | Units* |
|---|---|---|
| Silver Fox | 103 | 172 |
| Evergreen Farms | 49 | 77 |
| Aspen Ridge Estates | 126 | 217 |
| Chally Farm | 154 | 224 |
| York Wood Estates | 178 | 185 |

*(subject to change)*

**SECURITY:**
- A first lien on all Special Taxes imposed upon all property within each Special Service Area.
- A Reserve Fund equal to 10% of the initial par amount of the Bonds.
- the Special Service Areas will <u>not</u> be cross-collateralized

**USE OF PROCEEDS:** The proceeds of the Bonds will be used to 1) purchase and/or construct certain Public Improvements; 2) fund a debt service reserve equal to 10% of par; 3) to pay capitalized interest for up to 25 months; and, 4) pay costs of issuance.

**COUPON:** TBD

**FINAL MATURITY:** March 1, 2017

**AMORTIZATION:** Amortization will be in years 2014 through 2017.

## DRAFT

**STRUCTURE:**

Pursuant to a Special Tax Roll, the Special Service Area Tax from each special service area will be due and payable in full upon the transfer of title on the property. Effectively, this structure will mandate the Special Tax be prepaid once the Developer no longer owns the property (i.e., prior to the time a homeowner takes possession). At each closing, the payoff amount would be deposited with the bond trustee and the City would issue a lien release. Quarterly, the Trustee would use all prepayments to redeem bonds. *See "Special Mandatory Redemption from Property Owner Prepayment."*

Beginning in 2009, each owner will be required to make special tax payments based on interest only for the special service area debt allocable to their property. Beginning with the June 2014 special tax payment, the special service area debt will begin to amortize for any unsold units.

**AVERAGE ESTIMATED SPECIAL TAX PAYMENTS: (per unit)**

### Average Estimated Tax Payments

| Year | Amount[1] |
|------|-----------|
| 2009 | $1,196 |
| 2010 | 1,196 |
| 2011 | 1,196 |
| 2012 | 1,196 |
| 2013 | 6,485 |
| 2014 | 6,485 |
| 2015 | 6,485 |
| 2016 | 4,185 |

[1]  - includes principal and interest
   - assumes an average debt of $22,955/unit
   - assumes title does not transfer
   - assumes no prepayment and an average Debt Service Reserve Credit of $2,295/unit

**ESTIMATED SOURCES AND USES OF FUNDS:**

Sources:

| | |
|---|---|
| Bond Proceeds | $20,086,000 |
| Original Issue Discount[1] | (200,860) |
| City Funds | 1,990,880 |
| Interest Earnings[2] | 619,480 |
| | 22,495,500 |

Uses:

| | |
|---|---|
| Improvements | 17,743,660 |
| Debt Service Reserve[3] | 2,008,600 |
| Capitalized Interest[4] | 2,301,520 |
| Costs of Issuance[5] | 441,720 |
| | 22,495,500 |

[1]  In order to allow for prepayment at any time without penalty, the bond purchasers will require a 1% discount on the bonds at the time of issuance.
[2]  Interest is earned on the unspent bond proceeds held by the bond trustee.
[3]  The Debt Service Reserve is required by bondholders and will be returned pro rata at the time of each lot payoff. See "Debt Service Reserve."
[4]  Interest is capitalized through March 1, 2009. The first tax bill will be June 2009.
[5]  Costs of issuance are estimates and subject to change.

<u>DRAFT</u>

EXHIBIT FFF

**DEBT SERVICE RESERVE:** A Debt Service Reserve equal to 10% of the par amount of the Bonds will be required by the bondholders. A pro rata amount of the Debt Service Reserve will be used to reduce the payoff amount (see "Payoff") at the time the lien is released (the "Debt Service Reserve Credit"). The Debt Service Reserve Credit will not be available to any property owner that is delinquent in their special tax payments.

**PAYOFF:** Based on a $20,086,000 bond issue, the payoff figure per parcel would be:

| Project | Fee per DU | Bond Costs | Total Tax per DU | DSR Credit | Payoff Amount[1] |
|---|---|---|---|---|---|
| City of Yorkville | | | 1,990,880 | | |
| Silver Fox | 17,118 | 4,709 | 21,827 | 2,183 | 19,644 |
| Evergreen Farm | 20,647 | 5,680 | 26,327 | 2,633 | 23,694 |
| Aspen Ridge Estates | 17,982 | 4,946 | 22,928 | 2,293 | 20,635 |
| Chally Farm | 17,442 | 4,798 | 22,240 | 2,224 | 20,016 |
| York Wood Estates | 18,430 | 5,070 | 23,500 | 2,350 | 21,150 |

[1] Difference between "Payoff Amount" and "Fee per DU" equals each unit's per share cost of the Costs of Issuance and the Capitalized Interest.

**ANNEXATION AGREEMENT:** It is contemplated that each developer will agree in its Annexation Agreement to the formation of the special service area on its property and the imposition of the special tax. In order to assure an adequate number of units is included and the resultant special tax is acceptable, all annexations would need to occur simultaneously.

**METHOD OF SALE:** Limited Offering

**DENOMINATION:** $100,000 with increments of $1,000 in excess thereof.

**BOND FORM:** Book-entry Only through DTC

**ANTICIPATED RATING:** None

**TAXATION:** Exempt from federal taxes; not subject to AMT; not exempt from State of Illinois income taxes.

**INTEREST PAYMENT DATES:** March 1 and September 1, commencing September 1, 2007

**PRINCIPAL PAYMENT DATES:** March 1, commencing March 1, 2014

**OPTIONAL REDEMPTION:** The Bonds are subject to mandatory redemption by the City prior to maturity.

**SPECIAL MANDATORY REDEMPTION FROM PROPERTY OWNER PREPAYMENT:** The Bonds are subject to mandatory redemption on any Interest Payment Date, in par, from prepayments of Special Taxes made in accordance with the Ordinance of the City establishing the Area (the "Establishing Ordinance") and deposited into the Special Redemption Account of the Bond Fund, at a redemption price of par, together with accrued interest on such Bonds to the date of

# DRAFT

redemption. The Bonds will be called in order of maturity.

When the amount on deposit in the Special Redemption Account equals $1,000, such amount shall be used to redeem Bonds on the next Interest Payment Date at the redemption prices set forth above.

**ACCELERATION:** The Indenture does not permit the acceleration of the principal of the Bonds upon the occurrence of an Event of Default under the Indenture.

**ABATEMENT:** Annually on or before the last Tuesday in December, the City shall adopt an abatement ordinance abating the Special Tax to the extent monies are on deposit in the Principal and Interest Account of the Bond Fund and to adjust the levy for prepayment that occurred during the year.

**BOND COUNSEL:** Foley & Lardner

**UNDERWRITER:** William Blair & Company

**TRUSTEE:** Bank of New York

**BILLING AND COLLECTING:** The County will bill and collect the special service area tax.

**ADMINISTRATOR:** The City will hire David Taussig & Associates as the special service area administrator (the "Administrator") to assist the City in the levy, abatement and cellection process.

FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB

# EXHIBIT C

STATE OF ILLINOIS     )
                    ) ss
COUNTY OF KENDALL   )

200600031430
Filed for Record in
KENDALL COUNTY, ILLINOIS
PAUL ANDERSON
09-22-2006 At 02:31 pm
ORDINANCE                41.00
RHSP Surcharge            10.00

## ORDINANCE NO. 2006- 76

## AN ORDINANCE ANNEXING CERTAIN TERRITORY TO THE

## UNITED CITY OF YORKVILLE, KENDALL COUNTY, ILLINOIS

### (Aspen Ridge)

WHEREAS, a written petition, signed by the legal owner of record of all land within the territory hereinafter described, has been filed with the City Clerk of the United City of Yorkville, Kendall County, Illinois, requesting that said territory be annexed to the United City of Yorkville; and,

WHEREAS, there are no electors residing within the said territory, and,

WHEREAS, the said territory is not within the corporate limits of any municipality but is contiguous to the United City of Yorkville; and,

WHEREAS, legal notices regarding the intention of the United City of Yorkville to annex said territory have been sent to all public bodies required to receive such notices by state statute; and,

WHEREAS, copies of such notices required to be recorded, if any, have been recorded in the Office of the Recorder Kendall County, Illinois; and,

WHEREAS, the legal owner of record of said territory and the United City of Yorkville have entered into a valid and binding annexation agreement relating to such territory; and,

WHEREAS, all petitions, documents, and other necessary legal requirements are in full compliance with the terms of the annexation agreement and with the statutes of the State of Illinois, specifically Section 7-1-8 of the Illinois Municipal Code; and,

WHEREAS, it is in the best interests of the United City of Yorkville that the territory be annexed thereto,

NOW, THEREFORE, BE IT ORDAINED by the Mayor and City Council of the United City of Yorkville, Kendall County, Illinois, as follows:

SECTION 1: The following described territory,

*That territory described in the Legal Description which is attached hereto and made a part of this Ordinance.*

that territory also being indicated on an accurate map of the annexed territory (which is attached hereto and made a part of this Ordinance), is hereby annexed to the United City of Yorkville, Kendall County, Illinois.

SECTION 2: The City Clerk is hereby directed to record with the Kendall County Recorder and to file with the Kendall County Clerk a certified copy of the Ordinance, together with an accurate map of the territory annexed attached to this Ordinance.

SECTION 3: This Ordinance shall be in full force and effect from and after its passage and approval as provided by law.

| JAMES BOCK | y | JOSEPH BESCO | y |
| VALERIE BURD | n | PAUL JAMES | y |
| DEAN WOLFER | y | MARTY MUNNS | y |
| ROSE SPEARS | n | JASON LESLIE | — |

Approved by me, as Mayor of the United City of Yorkville, Kendall County,
Illinois, this ___8th___ Day of ___August___, A.D. 2006.

MAYOR

Passed by the City Council of the United City of Yorkville, Kendall County,
Illinois this ___8th___ day of ___August___, A.D. 2006.

ATTEST:

CITY CLERK

Prepared by:

John Justin Wyeth
City Attorney
United City of Yorkville
800 Game Farm Road
Yorkville, IL 60560

EXHIBIT A

*LEGAL DESCRIPTION*

THAT PART OF SECTION 5 AND THAT PART OF THE EAST HALF OF SECTION 6, AND THAT PART OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF UNIT FIVE, FOXLAWN; THENCE NORTH 67 DEGREES 26 MINUTES 00 SECONDS EAST ALONG THE SOUTHERLY LINE OF UNIT FIVE, FOXLAWN 816.1 FEET TO THE SOUTHEASTERLY CORNER THEREOF; THENCE NORTH 67 DEGREES 20 MINUTES 16 SECONDS EAST ALONG A FENCE LINE 1473.92 FEET; THENCE SOUTH 16 DEGREES 21 MINUTES 28 SECONDS EAST ALONG A FENCE LINE 1537.61 FEET; THENCE SOUTH 16 DEGREES 28 MINUTES 31 SECONDS EAST ALONG A FENCE LINE 2,228.02 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF ILLINOIS STATE ROUTE NUMBER 71, THIS COURSE HEREINAFTER REFERRED TO AS LINE 'A'; THENCE WESTERLY ALONG SAID NORTHERLY RIGHT OF WAY LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5105.59 FEET, A DISTANCE OF 90.13 FEET TO A LINE DRAWN PARALLEL WITH AND 90 FEET WESTERLY OF, AS MEASURED AT RIGHT ANGLES TO, LINE 'A' AFORESAID; THENCE NORTH 16 DEGREES 28 MINUTES 31 SECONDS WEST ALONG SAID LINE DRAWN PARALLEL WITH LINE 'A' 484.93 FEET; THENCE SOUTH 72 DEGREES 05 MINUTES 18 SECONDS WEST 473.01 FEET; THENCE SOUTH 16 DEGREES 28 MINUTES 31 SECONDS EAST 272.84 FEET; THENCE SOUTH 32 DEGREES 41 MINUTES 01 SECONDS EAST 188.57 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF SAID ROUTE NUMBER 71; THENCE SOUTH 74 DEGREES 35 MINUTES 16 SECONDS WEST ALONG SAID NORTHERLY RIGHT OF WAY LINE 440.05 FEET TO THE SOUTHEASTERLY CORNER OF A TRACT OF LAND CONVEYED TO GEORGE C. BELL AND WIFE BY WARRANTY DEED RECORDED JANUARY 13, 1971 AS DOCUMENT 71-93; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG AN EASTERLY LINE OF SAID BELL TRACT 240 FEET TO AN ANGLE IN SAID EASTERLY LINE; THENCE NORTH 74 DEGREES 42 MINUTES 30 SECONDS EAST 100 FEET; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST 360 FEET; THENCE SOUTH 74 DEGREES 42 MINUTES 30 SECONDS WEST 371 FEET; THENCE SOUTH 18 DEGREES 07 MINUTES 30 SECONDS EAST 182 FEET; THENCE SOUTH 74 DEGREES 47 MINUTES 30 SECONDS WEST 418 FEET TO THE EASTERLY LINE OF A TRACT OF LAND CONVEYED TO MERVIN J. WISSMILLER AND WIFE BY WARRANTY DEED RECORDED APRIL 30, 1974 AS DOCUMENT 74-1947; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG SAID EASTERLY LINE 576.02 FEET TO THE NORTHEAST CORNER OF SAID WISSMILLER TRACT; THENCE SOUTH 72 DEGREES 23 MINUTES 49 SECONDS WEST ALONG THE NORTHERLY LINE OF SAID TRACT 720.25 FEET; THENCE NORTH 13 DEGREES 56 MINUTES 14 SECONDS WEST 2495.06 FEET TO THE POINT OF BEGINNING, (EXCEPT THAT PART OF THE SOUTHWEST QUARTER OF SECTION 5, AND THAT PART OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 5; THENCE EASTERLY ALONG THE SOUTH LINE OF SAID SECTION 5, 362.34 FEET; THENCE NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST 189.5 FEET TO THE NORTH LINE OF ILLINOIS STATE ROUTE NUMBER 71; THENCE WESTERLY ALONG SAID NORTH LINE TO A POINT WHICH IS 90.0 FEET NORMALLY DISTANT WESTERLY OF THE LAST DESCRIBED COURSE; THENCE WESTERLY ALONG SAID NORTH LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5,105.59 FEET, 191.17 FEET; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 117.50 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 112.0 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 36.76 FEET TO AN ANGLE POINT IN SAD NORTH LINE; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 278.0 FEET FOR THE POINT OF BEGINNING; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE, 125.59 FEET TO THE SOUTHEASTERLY CORNER OF A TRACT OF LAND CONVEYED TO GEORGE C. BELL, AND HIS WIFE BY WARRANTY DEED RECORDED JANUARY 13, 1971 AS DOCUMENT 71-93; THENCE NORTH 18 DEGREES 07 MINUTES 30 SECONDS WEST ALONG AN EASTERLY LINE OF SAID BELL TRACT, 240 FEET TO AN ANGLE IN SAID EASTERLY LINE; THENCE NORTH 74 DEGREES 42 MINUTES 30 SECONDS EAST TO A LINE DRAWN NORTHWESTERLY FROM, AS MEASURED AT RIGHT ANGLES TO THE NORTHERLY LINE OF SAID ROUTE 71, FROM THE POINT OF BEGINNING; THENCE SOUTHEASTERLY ALONG SAID LINE TO THE POINT OF BEGINNING; AND ALSO EXCEPT THAT PART OF THE SOUTH HALF OF SECTION 5, TOWNSHIP 36 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 5; THENCE EASTERLY ALONG THE SOUTH LINE OF SAID SECTION 5, 362.34 FEET; THENCE NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST 189.5 FEET TO THE NORTH LINE OF ILLINOIS STATE ROUTE NUMBER 71; THENCE WESTERLY ALONG SAID NORTH LINE TO A POINT WHICH IS 90.0 FEET NORMALLY DISTANT WESTERLY OF THE LAST DESCRIBED COURSE; THENCE WESTERLY ALONG SAID NORTH LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 5,105.59 FEET, 191.17 FEET; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 117.50 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 112.0 FEET; THENCE NORTH 30 DEGREES 36 MINUTES 39 SECONDS WEST 188.57 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 30 DEGREES 36 MINUTES 39 SECONDS EAST 188.57 FEET; THENCE SOUTH 82 DEGREES 06 MINUTES 09 SECONDS WEST ALONG SAID NORTH LINE 36.76 FEET TO AN ANGLE POINT IN SAID NORTH LINE; THENCE SOUTH 76 DEGREES 07 MINUTES 12 SECONDS WEST ALONG SAID NORTH LINE 278.0 FEET; THENCE NORTHWESTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE 300.0 FEET; THENCE NORTHEASTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE 259.40 FEET TO A LINE DRAWN NORTH 14 DEGREES 17 MINUTES 11 SECONDS WEST FROM THE POINT OF BEGINNING; THENCE SOUTH 14 DEGREES 17 MINUTES 11 SECONDS EAST 123.25 FEET TO THE POINT OF BEGINNING) IN THE TOWNSHIP OF KENDALL, KENDALL COUNTY, ILLINOIS.

Requested By: img 11/20/2006 Case 1:08-cv-04479 Document 1-6 Filed 08/17/2008 Page 6 of 6

PLAT OF ANNEXATION
TO THE UNITED CITY OF YORKVILLE
PART OF SECTION 1, TOWNSHIP 36 NORTH, RANGE 6 EAST AND SECTION 6, TOWNSHIP 36
NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN THE UNITED CITY OF
YORKVILLE, FOX AND KENDALL TOWNSHIPS, KENDALL COUNTY, ILLINOIS

```
FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB
```

# EXHIBIT D



**United City of Yorkville Memo**
800 Game Farm Road
Yorkville, Illinois 60560
Telephone:  630-553-4350
Fax:          630-553-7575

# CONFIDENTIAL MEMO
### THIS MEMO CONTAINS ATTORNEY WORK PRODUCT AND CONFIDENTIAL ATTORNEY/CLIENT COMMUNICATION, IT IS NOT SUBJECT TO DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Date:     April 6, 2006

To:       Mayor and Aldermen

From:    John Justin Wyeth, City Attorney

Subject:  Meeting with County Staff re Landfill

---

Mayor and Aldermen

Representatives of the County met with the Mayor and City Staff on March 15, 2006. The County called for the meeting and stated that they wanted to see what issues the City might have with a landfill on Mr. Hamman's land on the south side of Rt. 71 at a point which is south of both the current Commonwealth Edison lines, and south of the proposed Prairie Parkway.

In attendance for the City were the Mayor, John Crois, Travis Miller and John Wyeth. (After discussing this matter with Attorney Derke Price, we agreed that his attendance would create undue suspicions for the County that would be better avoided at this time.) In attendance for the County were John Church (County Board Chairman), Melissa Barnhart (State's Attorney), and the County's Solid Waste Attorney's Jeff Jeep and Michael Blazer.

The City asked for a description of the County's intentions, both in terms of a landfill development, and the County's expectations for the United City of Yorkville. Briefly, the County (through Jeep and Blazer—mostly Blazer) stated as follows:

1.)   They have received inquiries from two developers indicating interest in siting two separate landfills in the County. The first is the Hamman site, and the second is a group controlled by Mr. Pat Harbour, (Kendall Land and Cattle, Inc.) which is considering a Site near Route 80 in Southeast Kendall County. They stated that they expect to receive

Confidential     Page 2     4/6/2006

and I have gathered, all indications are that the Southeast Site will not be ready for petition in 6 months.]   The remainder of the discussion centered around the Rt. 71 site. The primary issue is 'traffic' [no surprise to us].  This led to point #2.

2.)  They announced that in consideration of the impact upon the City, the County would negotiate for favorable rates for our common trash removal contract, and monetary compensation of approximately $25,000 per year.  Again, we just listened at this time, and made no response. The Mayor made is clear that Yorkville would be the most impacted City, by a large factor as compared to any other municipality.  However, the group did not indicate the disappointment in the rather small offer, rather the Mayor asked that the City be allowed to consider the discussion, and get back to the County in a few weeks.

While the County explained that they would simply "write us into" their Host Agreement with the landfill operator, it is the Mayor's opinion, with concurrence from both myself and Derke Price, that we negotiate directly with Mr. Hamman and his group.   I will respond to Attys Blazer and Barnhart indicating that we intend to contact Mr. Hamman and his Group for this purpose.  This will provide the following for the City:

> A.  Provide a reason, and a platform for ongoing discussion with the Hamman group.  This will be very useful since we have reason to be talking with them on the more direct annexation/host scenario anyway.  See the companion memos on those topics.
>
> B.  This is responsive to the County and provides them with a common sense understanding that they have "taken care of Yorkville."

It is apparent that the County is intent on going along with the acceptance of an application from Mr. Hamman with little or no consideration for the City of Yorkville. This was predicted by the Mayor, Derke Price, and the Hamman Group.  It is for this reason that the City will be well served to strongly consider all alternatives, including annexing and hosting this development as a City of Yorkville project.  Again, see the companion memo's on this topic.

```
FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB
```

# <u>EXHIBIT E</u>



**United City of Yorkville Memo**
800 Game Farm Road
Yorkville, Illinois 60560
Telephone:  630-553-4350
Fax:          630-553-7575

# CONFIDENTIAL MEMO
### THIS MEMO CONTAINS ATTORNEY WORK PRODUCT AND CONFIDENTIAL ATTORNEY/CLIENT COMMUNICATION, IT IS NOT SUBJECT TO DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Date:      April 6, 2006

To:        Mayor and Aldermen

From:      John Justin Wyeth, City Attorney

Subject:   Common Theme and Logic for Landfill

---

This memo is specifically designed to propose and articulate a united, common theme for the City's action in regard to the proposed Hamman landfill.  It is my advice and counsel that the City and its constituents will always be best served by forthright attention, and diligence regarding any and all threats/opportunities that affect the City.

It is my observation that you have exercised such diligence in the past and intend to do so in this instance, which is commendable.

The proposed landfill along Rt 71 will uniquely impact the City. The City is the nearest, largest population base to the site.  (Millbrook is second in both categories) The trucks, coming from the east, will travel through Yorkville.  Since prevailing winds are from West to East, Yorkville is "downwind".

Yorkville will be directly, and considerably, impacted far in excess of any other municipality.  As the City grows, its annexed territory and constituents will displace the "county area" to the east of the landfill site to a point were the City will ultimately become virtually the *only* municipality impacted.

However, as currently structured the City will reap virtually no benefits.  The offer of "favorable rates for garbage removal, and $25,000 per year" [See the companion memo on the City's meeting with the County] is deficient.  Not only will that offer fall far short of the actual cost for road improvement, alone, it is a small fraction of the projected income available to the host government agency (County).   In other words, there is a

Confidential        Page 2        4/6/2006

great deal of revenue available to offset the burden, but the City is presently in no position to secure that revenue.

These are the facts.

*[At this point of this memo, it is important for me to relate to you, both individually and collectively, that I understand my role as City Attorney. I am your advisor and consultant, only. I should avoid discussions on policy. Hopefully, you have learned that I exercise extreme caution in my opinions to never lead or lean to one side or another in a policy discussion. It may become necessary to take a side while rendering an opinion and/or informing you. But, I will consciously do so only when I believe that a clear reason exists, anchored in legal issues—not policy choices.*

*I feel a little uncomfortable in assisting you form and articulate a rational for a policy choice, i.e." whether or not to annex and control the landfill siting process". This will **always be your choice**, and my goal is not to influence that choice. Rather, I believe that I am acting upon a consensus that was evident in the meeting at which both Atty's Derke Price and Glen Sechen addressed the Council. This consensus has been further exhibited to me by several of you individually. In addition, I have not heard anything contrary to a consensus regarding this matter, and what follows is simply a compilation of that consensus. My goal here is to use the tool of confidential communication (Be sure to keep this memo confidential), and to gather together the consensus and suggest a single response to the questions that I expect that you will receive. Please, please, if you feel that I have overstepped my place/authority/usefulness by providing this memo, call me.]*

As currently structured, the City will suffer the entire burden, while obtaining little benefit. It is the possibility of "**All Burden/No Benefit**" that I recommend to you as leading theme driving the City to strongly consider controlling the process through annexation and hosting. The City has been through this already with the Menards Distribution facility – all the trucks, no revenue.

It is my further suggestion and offer to you for consideration that under the "**All Burden/No Benefit**" rationale (coupled with the laws and procedures that govern the landfill process) you can explain your position and the City's involvement as divided into two logical steps:

1. <u>Gain control of the process.</u> This can only be done by annexation of the territory, and acceptance of the petition to site the landfill in Yorkville. The alternative would be to sit idly on the side and watch the petition go to the County. This would leave the City on the outside of the process with no control.

2. <u>Objectively consider the petition.</u> Note: "**objectively**". It is important to understand that annexation of the land is far from *accepting* the landfill. Annexation provides control but does not obligate the City to approve. In fact, the law is clear that the City (specifically City Council Members) must remain objective. This is why you *must not engage in discussion* about the specifics of

Confidential       Page 3       4/6/2006

the process with anyone. However, you can explain the "**All Burden/No Benefit**" analysis that leads to a conclusion of annexation as the appropriate choice.

In summary, my suggestion for a common theme is that since the City is faced with the potential for "**All Burden/No Benefit**" (remembering the Menards Distribution Center), it is wise to annex the land and control the process. The City is not "approving" the landfill. That process comes next.

If you may indulge me to state the issue in more colorful terms, the City can be the "Hammer or the Nail". With Menards, the City was the Nail -- taking the brunt. This time, the City can be the Hammer -- directing the blows.

Please call me or otherwise discuss this matter with me as this matter moves forward. Under the attorney client privilege, I can assist the City Council in shaping your collective understanding without risking public disclosure of the strategy.

Please also review my companion memos to you on the topics of the Mayor and Staff's meeting with representatives of the County, and an over view of the annexation process to get to the Hamman landfill site.

FILED: AUGUST 7, 2008
08CV4479
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

JFB

# EXHIBIT F



**United City of Yorkville Memo**
800 Game Farm Road
Yorkville, Illinois 60560
Telephone:  630-553-4350
Fax:          630-553-7575

# CONFIDENTIAL MEMO
### THIS MEMO CONTAINS ATTORNEY WORK PRODUCT AND CONFIDENTIAL ATTORNEY/CLIENT COMMUNICATION, IT IS NOT SUBJECT TO DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Date:      April 6, 2006

To:        Mayor and Aldermen

From:      John Justin Wyeth, City Attorney

Subject:   Southwest Developments (Silver Fox, Evergreen Farm, Aspen Ridge, Chally Farm, Anderson Farm, and Meadowbrook Subdivision)

---

Please allow me to advise that the 6 above referenced developments will be coming forward, jointly, in the next 30 to 45 days for approval of Annexation, Zoning and Preliminary Plan. The developments are beyond the reach of current Sanitary Sewer and Water service. They have some unique Stormwater requirements. And, they (some to a greater or lesser extent) impact Fox Road, and are referenced in the Fox Road Study which concludes that Green Briar Road should be extended from the east through to Pavilion to serve these areas.

These developers are eager to move ahead, which is important to the City because these developments form the annexation corridor to the Hamman property on Rt. 71. Without these developments, we could not be entertaining the thought of hosting the landfill.

However, these developers *do not know how important they are* as forming the annexation corridor. Staff has positioned this matter as "you've been held up long enough, you need each other, and so we'll annex all of you together." There annexation agreements will be contingent on each other regarding funding of utility extension and the construction of Green Briar Road. If they ever learned about the contiguity corridor, they would surely ask for credit for fees, and/or other concessions that would be very costly to the City.

The reason that they "need each other" is to fund the extension of the utilities and pay for the extension of Green Briar Road. Jeff Freeman and Peter Raphael will present the "Southwest Infrastructure" plan at next Tuesday's City Council meeting. They will explain the nature of the utility expansion, and the funding mechanism. After careful thought, Peter Raphael has

Confidential        Page 2        4/6/2006

determined that the only way to pay for these utilities and expedite these developments is in the form of a Special Tax Bond, to be paid back by a Special Service Area (SSA).

It will be necessary to place the obligation to form the SSA *into the annexation agreements* for these Six Developments. Otherwise, they have no ability to pay to extend the utilities and they will not annex on the time line that the City needs to provide the annexation corridor to the Hamman property. The SSA Policy allows for this.

Please maintain confidentiality regarding the Hamman Property. These six individual developers all think that we are moving them along together 1) because they have been under application for nearly a year, and 2) because they need to come in together to form a joint SSA large enough to pay for all of the cost of the Utilities. This is all true. The good news for the City is that the cost of the extension of the Utilities will be borne by the residents causing the need, while at the same time, the City is able to extend its boundaries sufficiently to reach the Hamman parcel.

You will be learning about two more annexations – Borneman Farm and Schantz Property soon. These are the last two parcels to gain contiguity to Hamman. They will be brought in at the last possible moment, with the Hamman parcel. To bring them in any earlier would alert the County, and bring potential legal maneuvers that could frustrate the Hamman annexation and landfill petition to the City.

There are a lot of pieces to this puzzle, and I will do my best to keep you informed. Please feel free to call at any time.